Colorado Court of Appeals Opinions || October 8, 2015


Colorado Court of Appeals -- October 8, 2015
2015 COA 139. No. 11CA0623. People v. Marko.



 Â 

 
 
 
 COLORADO COURT OF APPEALS

 
 2015 COA 139

 
 



 Court of Appeals No. 11CA0623
 El Paso County District Court No. 08CR4173
 Honorable Larry Schwartz, Judge


 The People of the State of Colorado,

 Plaintiff-Appellee,

 v.

 Robert Hull Marko,

 Defendant-Appellant.


 JUDGMENT AFFIRMED IN PART, VACATED IN PART,
 AND CASE REMANDED WITH DIRECTIONS

 Division I
 Opinion by JUDGE BERGER
 Taubman and Kapelke*, JJ., concur

 Announced October 8, 2015


 Cynthia H. Coffman, Attorney General, Katherine A. Hansen, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

 Douglas K. Wilson, Colorado State Public Defender, Alan Kratz, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

 *Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, Â§ 5(3), and Â§ 24-51-1105, C.R.S. 2015.

 
 Â 

 Â¶1Â Â Â Â Â Â Â Â  Defendant, Robert Hull Marko, appeals the judgment of conviction entered on jury verdicts finding him guilty of first degree murder, two counts of sexual assault, and two counts of attempted sexual assault. 

 Â¶2Â Â Â Â Â Â Â Â  Marko makes a number of arguments, two of which raise issues of first impression. The arguments raising issues of first impression are:

 
 The court erred in denying Markoâs motions to suppress statements he made to the police and evidence seized during a search of his army barracks.

 
 His convictions must be reversed because the psychiatrist who conducted his sanity examination improperly opined on his substantive guilt and credibility.



 Marko also argues:

 
 The trial court erred in denying his challenge for cause to a prospective juror.

 
 The court erred in denying his motion for a mistrial after another prospective juror made certain statements during voir dire.

 
 Â The court erred in denying his constitutional challenges to the statutory scheme governing the insanity defense.

 
 The prosecutor committed prosecutorial misconduct.

 
 The evidence was insufficient to support his sexual assault convictions.

 
 His attempted sexual assault convictions must merge into his sexual assault convictions.

 
 His sexual assault convictions are multiplicitous and violate the prohibition against double jeopardy.



 Â¶3Â Â Â Â Â Â Â Â  We agree with Marko that his attempted sexual assault convictions merge into his sexual assault convictions and that his sexual assault convictions are multiplicitous. We thus vacate his attempted sexual assault and one of his sexual assault convictions. In all other respects, we affirm.

 I. Background[1]

 Â¶4Â Â Â Â Â Â Â Â  On October 10, 2008, the victimâs mother reported her nineteen-year-old daughter missing after she failed to return home that evening. The police determined that the victim had received aÂ message on October 9 through an online social network account from a user named âRex290,â with whom the victim had been in contact for several months, suggesting that they âget togetherâ the following day. The police established that Rex290 was Marko, a soldier stationed at a nearby military base.

 Â¶5Â Â Â Â Â Â Â Â  Officers from the El Paso County Sheriffâs Office contacted the military police at the base. In the early morning of October 11, military police officers (MPs) visited Marko to conduct a âmissing persons and welfare checkâ on the victim. The victim was not in Markoâs barracks room, and he denied knowing her.

 Â¶6Â Â Â Â Â Â Â Â  After the sheriffâs officers received information that a friend of the victim had seen her with Marko in the past, they went to the base to interview Marko. Initially, Marko again denied knowing the victim, but after repeatedly changing his story, he admitted that he had seen her on October 10.

 Â¶7Â Â Â Â Â Â Â Â  Sheriffâs officers conducted further interviews with Marko on October 11, 12, and 13. During the October 13 interview, Marko admitted that he had picked up the victim the morning of October 10 and driven into the mountains, where they had argued. He said that he had knocked the victim unconscious, and (either while sheÂ was unconscious or after she had regained consciousness) he had had vaginal and anal sex with her. He said that he then blindfolded and gagged her and cut her throat with a knife.

 Â¶8Â Â Â Â Â Â Â Â  Marko went with the sheriffâs officers to the mountains and they located the victimâs body. Marko told the officers where to find the cloths he had used as a blindfold and a gag, which were found, covered in blood, in the spot he indicated. A search of Markoâs barracks room revealed a knife with the victimâs DNA on its blade and a shirt with the victimâs blood on it.

 Â¶9Â Â Â Â Â Â Â Â  Marko was charged with various offenses, including first degree murder (after deliberation), first degree felony murder, and sexual assault. He pleaded not guilty and not guilty by reason of insanity (NGRI).

 Â¶10Â Â Â Â Â Â Â Â  At Markoâs jury trial, the psychiatrist who had conducted Markoâs sanity examination testified regarding Markoâs belief (which Marko had described to the police) that he was part of an ancient alien race of ruthless killers â the âblack raptors.â The psychiatrist testified, however, that Marko had maintained that his black raptor beliefs had nothing to do with the victimâs death.

 Â¶11Â Â Â Â Â Â Â Â  The psychiatrist opined that Marko suffered from âa mixed personality disorder involving antisocial and schizotypal traits,â attention deficit hyperactivity disorder, and Touretteâs disorder, but that Marko was legally sane at the time of the incident.

 Â¶12Â Â Â Â Â Â Â Â  Marko presented testimony from another psychiatrist who had evaluated him in connection with the case. That psychiatrist testified that he believed that at the time of the incident, Marko was in a dissociative state in which he could not control his actions. The psychiatrist opined that Marko was legally insane when he committed the offenses.

 Â¶13Â Â Â Â Â Â Â Â  The jury rejected Markoâs insanity defense and convicted him of first degree murder (after deliberation); two counts of sexual assault (labeled âvaginalâ and âanalâ on the verdict form); and two counts of attempted sexual assault (âvaginalâ and âanalâ) as crimes of violence. The jury acquitted Marko of first degree felony murder.

 Â¶14Â Â Â Â Â Â Â Â  The trial court imposed a sentence of life in prison without the possibility of parole for first degree murder; consecutive sentences of ten years to life in prison for sexual assault (vaginal) and attempted sexual assault (vaginal); and concurrent sentences of sixÂ years in prison for sexual assault (anal) and attempted sexual assault (anal).

 II. Challenge for Cause

 A. Facts

 Â¶15Â Â Â Â Â Â Â Â  The trial court informed the panel of prospective jurors of the charges and that Marko had pleaded NGRI. The court explained the legal definition of insanity and that the prosecution had the burden to establish beyond a reasonable doubt that Marko was sane when he allegedly committed the offenses.

 Â¶16Â Â Â Â Â Â Â Â  The trial court and the attorneys questioned certain members of the panel about their responses to written questionnaires. The court asked Juror C whether, if legal insanity were established at trial, he would be able to return a verdict of NGRI. Juror C responded that he would have a difficult time doing so, and that âit would have be so overwhelmingly [sic] that from a doctorâs point of view, psychologist, whoever you would have up there for me to go with, okay, he was definitely insane.â

 Â¶17Â Â Â Â Â Â Â Â  Juror C continued to make such comments throughout voir dire, including agreeing when defense counsel asked him whether insanity âneeds to be overwhelmingly proven, and [he felt] prettyÂ strongly about that.â However, he stated that he would follow the law and that he could return a verdict of NGRI if the evidence established that Marko was insane at the time of the offense.

 Â¶18Â Â Â Â Â Â Â Â  Defense counsel challenged Juror C for cause on the basis that âhe would have a hard time following the burden of proofâ regarding insanity. The court denied the challenge, explaining that it believed Juror C when he said that he could return a verdict of NGRI if the evidence established that Marko was legally insane.

 Â¶19Â Â Â Â Â Â Â Â  The defense used a peremptory challenge to excuse Juror C.

 B. Law and Application

 Â¶20Â Â Â Â Â Â Â Â  Marko argues that the court erred in denying the challenge for cause to Juror C because Juror C made unrehabilitated statements indicating an inability to follow the law on the insanity defense. We need not determine whether the trial court erred because, to the extent that there was any error, Marko has not established that he was prejudiced by it.

 Â¶21Â Â Â Â Â Â Â Â  Juror C did not serve on the jury. Thus, even if the trial court abused its discretion by denying the challenge for cause, reversal would not be automatic. See People v. Maestas, 2014 COA 139M, Â¶12. Rather, under People v. Novotny, 2014 CO 18, to obtain reversal, Marko must establish a reasonable probability that any error contributed to the verdict. Maestas, Â¶12.[2] To do so, Marko would have to make some showing of prejudice, for example that âas a result of the trial courtâs error, a different biased or incompetent juror sat on the jury.â Id. He has not done so here.

 Â¶22Â Â Â Â Â Â Â Â  Accordingly, the trial courtâs denial of Markoâs challenge for cause to Juror C does not require reversal.

 III. Motion for Mistrial
 A. Facts

 Â¶23Â Â Â Â Â Â Â Â  During voir dire, defense counsel explained that if the jury returned a verdict of NGRI, Marko would be committed to the Colorado Mental Health Institute at Pueblo (CMHIP) âuntil and only if this court [were] to ever say he could be released.â A prospective juror inquired as to âhow many years someone could go awayâ if the jury returned a verdict of NGRI. Defense counsel replied:

 That is not something we get to talk about, and that is not something you get to know. The only thing you get to know is if you return a verdict of [NGRI], that [Marko] must be committed to [CMHIP] and he must be held until and only if this court ever decides that he should be released. So I canât give you that number because that number doesnât exist.

 Â¶24Â Â Â Â Â Â Â Â  After prospective jurors expressed concerns about not knowing how long Marko would be committed if the jury found him NGRI, the trial court instructed the jury that information regarding the length of his possible commitment âmust have no persuasive bearing on the verdict . . . arrive[d] at under the evidence,â but if Marko were found NGRI, he would âbe confined until such time as he is determined to no longer require hospitalization because he no longer has a mental disease or defect which is likely to cause him to be dangerous to himself, to others or to the community in the reasonably foreseeable future.â The court then stated, â[s]o I can tell [you] thereâs no answer to how much time that could take. It is whatever it is in each personâs individual situation.â

 Â¶25Â Â Â Â Â Â Â Â  A short time later, Juror M made the following statements in the presence of the panel:

 I have to agree with [these two prospective jurors] on [Marko] being insane and servingÂ the time. I donât think the time that he serves is going to fit the crime. I have a 12-year-old daughter that was raped when she was 12 [sic]. I was in Desert Storm. When I came back, he was almost out of jail. The time donât fit the crime. So I think thatâs why they want to know how much time heâs going to get. I donât feel that he should go to Pueblo and then six months later heâs sane and he walks. If you look at Pueblo, thereâs people walking out of that building all the time.

 Â¶26Â Â Â Â Â Â Â Â  The court again explained, â[p]eople should not consider how much time [a finding of NGRI] means in terms of hospitalization. That is not an issue that can be considered.â

 Â¶27Â Â Â Â Â Â Â Â  Defense counsel challenged Juror M for cause and also moved for a mistrial on the basis that his comments had tainted the entire jury panel âto believe that if, in fact, [the jury] return[s] a verdict of [NGRI], that [Marko] will be released in a very short period of time.â The court granted the challenge for cause but denied the motion for a mistrial, stating:

 This panel is a very smart panel, and theyâve already indicated in some instances that they reject comments made by other parties because theyâve already made up their mind. [Juror M] in court comes across as just an angry person. At least he did with the last comments. He has an ax to grind. . . . He spouted off a bunch of things that are not true. These are intelligent people. These are issuesÂ that we dealt with, such as I even read them the instruction that said he could be let out at any time if I make the appropriate determination. Thatâs what the law is. So this jury panel is not in any way tainted.

 B. Law and Application

 Â¶28Â Â Â Â Â Â Â Â  Marko argues that the trial court erred in declining to order a mistrial, or take any other curative action, after Juror Mâs statements because he claims that the statements tainted the jury panel with unfairly prejudicial information that otherwise would not have been received. We disagree.

 Â¶29Â Â Â Â Â Â Â Â  We review a trial courtâs decision to deny a mistrial for an abuse of discretion. People v. Mersman, 148 P.3d 199, 203 (Colo. App. 2006). A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misconstrues or misapplies the law. Maestas, Â¶11.

 Â¶30Â Â Â Â Â Â Â Â  â[A] criminal defendant is entitled to have the jury reach a verdict based solely on the evidence presented in the courtroom.â Dunlap v. People, 173 P.3d 1054, 1091 (Colo. 2007). A juryâs exposure to extraneous information implicates a defendantâs due process right to a fair trial. Id.; see also People v. Harmon, 284 P.3d 124, 127 (Colo. App. 2011).Â 

 Â¶31Â Â Â Â Â Â Â Â  In determining whether a juryâs exposure to extraneous information violated a defendantâs right to a fair trial, we engage in a two-part inquiry. We ask, first, whether extraneous information was improperly before the jury and, second, whether there is a reasonable possibility that the extraneous information influenced the verdict to the detriment of the defendant. See People v. Harlan, 109 P.3d 616, 624-25 (Colo. 2005); see also People v. Manzanares, 942 P.2d 1235, 1238 (Colo. App. 1996) (applying this standard to statements by a prospective juror during voir dire).

 Â¶32Â Â Â Â Â Â Â Â  â[A]ny information that is not properly received into evidence or included in the courtâs instructions is extraneous to the case and improper for juror consideration.â Harlan, 109 P.3d at 624. Arguably, Juror Mâs statements introduced extraneous information by implying that some defendants who were found NGRI were released from commitment at CMHIP after six months. The statements potentially also implied that Juror M had personal knowledge of this fact. Because Juror M made these statements in the presence of the jury panel, jurors who ultimately sat on the jury might have heard them. We thus assume that the statements constituted extraneous information improperly before the jury.

 Â¶33Â Â Â Â Â Â Â Â  However, we conclude that there is no reasonable possibility that the statements influenced the verdict.

 Â¶34Â Â Â Â Â Â Â Â  In cases in which courts have concluded that prospective juror statements made during voir dire prejudiced a defendantâs ability to receive a fair trial, the jurorsâ statements indicated a reliable basis of knowledge for the extraneous information provided. For instance, in Mach v. Stewart, 137 F.3d 630, 632, 634 (9th Cir. 1997), a child sexual assault case in which the principal issue was whether the victim or the defendant was more believable, a social worker with a background in child psychology stated during voir dire that every time one of her child clients had reported sexual assault, it had been confirmed. She also repeatedly stated that in her three years with child protective services, she was not aware of any case in which a child had lied about being sexually assaulted. Id. at 632. The court held that given the jurorâs expert-like statements, the certainty with which they were made, the years of experience that led to them, the number of times they were repeated, and the nature of the case, â[t]here can be no doubt that [the jurorâs] statements had to have a tremendous impact on the juryâs verdict.â Id. at 634.Â 

 Â¶35Â Â Â Â Â Â Â Â  Similarly, in State v. McMahon, 894 P.2d 313, 316 (Mont. 1995), in which one of the primary issues was whether the defendant had the ability to carry out his threats, prospective jurors described situations they had witnessed or heard about that showed the defendant could be violent. The court held that these statements poisoned the entire jury panel and prejudiced the defendantâs right to a fair and impartial jury. Id. at 316-17.

 Â¶36Â Â Â Â Â Â Â Â  In this case, other than the ambiguous statements about his daughterâs assailant (it is unclear whether he was imprisoned or committed to a mental hospital), Juror Mâs statements did not indicate that he had any personal knowledge regarding how long those found NGRI were committed. Thus, whether other jurors would have relied on the information he provided is questionable.

 Â¶37Â Â Â Â Â Â Â Â  Moreover, defense counsel and the trial court informed the panel multiple times that there was no way to know in advance how long Marko would be committed if the jury found him NGRI and, regardless, that such information must not influence the juryâs determination of guilt or sanity. Before deliberations, the jury was provided with a written instruction that if found NGRI, Marko would be committed until âhe is determined to no longer requireÂ hospitalization,â but that â[t]his [was] an informational instruction and must have no persuasive bearing on the verdict [the jury] arrive[d] at under the evidence.â

 Â¶38Â Â Â Â Â Â Â Â  Under these circumstances, we decline to assume that the statements affected the verdict merely because they were improper. See Manzanares, 942 P.2d at 1238 (âThe mere possibility of prejudice resulting from the asserted juror misconduct is not sufficient to warrant reversal.â). The trial court therefore did not abuse its discretion in failing to declare a mistrial.

 Â¶39Â Â Â Â Â Â Â Â  Marko argues that even if a mistrial was not warranted, reversal is required because the court failed to take any other curative measures. But Marko did not request a curative instruction or ask that the trial court canvass jurors to determine whether they had heard the statements and, if so, whether it affected their ability to decide the case fairly. Consequently, we review the courtâs failure to do so for plain error. Mersman, 148 P.3d at 204. For the reasons discussed above, we conclude that the statements by Juror M were not so prejudicial or inflammatory that the court committed plain error in not sua sponte issuing a curative instruction or canvassing the prospective jurors.

 Â¶40Â Â Â Â Â Â Â Â  Accordingly, Juror Mâs statements during voir dire do not require reversal.

 IV. Motions to Suppress

 Â¶41Â Â Â Â Â Â Â Â  On October 11, Marko was brought to the military police station by MPs for an interview with two sheriffâs officers at around 2:30 or 2:45 a.m. At that time, the sheriffâs officersâ principal objective was finding the victim. They did not then know if a crime had been committed or if Marko was involved in the victimâs disappearance in any way.

 Â¶42Â Â Â Â Â Â Â Â  At 3:26 a.m., less than an hour after the interview began, Marko was given Miranda warnings, see Miranda v. Arizona, 384 U.S. 436 (1966), and video recording equipment was set up to record the interview.

 Â¶43Â Â Â Â Â Â Â Â  After waiving his Miranda rights, Marko told the sheriffâs officers that he and the victim had had a physical altercation in the foothills (a different location than where he ultimately claimed that he had killed her), they struggled, he pushed her, and she fell over the edge of a cliff.

 Â¶44Â Â Â Â Â Â Â Â  Around 5:00 a.m., a sheriffâs detective arrived to continue the interview. At around 6:00 a.m., Marko offered to take the detective to the foothills to locate the victimâs body.

 Â¶45Â Â Â Â Â Â Â Â  The detective and another sheriffâs officer took Marko to the spot he indicated, but they eventually went back to base when they did not find anything relating to the victim. The interview resumed at around 9:00 a.m., and lasted until around 3:00 or 3:30 p.m.

 Â¶46Â Â Â Â Â Â Â Â  Also on October 11, a search was conducted, pursuant to a warrant, of Markoâs barracks room. Items of his clothing and a knife were seized.

 Â¶47Â Â Â Â Â Â Â Â  After the interview, Marko remained at the base. Pursuant to military or base policy, the military police placed Marko on a seventy-two-hour hold. He was held in custody by MPs and slept in the military police station on the night of October 11. The detective informed Marko that he had nothing to do with the military hold.

 Â¶48Â Â Â Â Â Â Â Â  The following day, October 12, the detective returned to the base to re-interview Marko at the military police station. The interview began around 12:00 or 1:00 p.m. and ended around 2:30 or 3:00 p.m. At the beginning of this interview, the detective again advised Marko of his Miranda rights, which he waived.

 Â¶49Â Â Â Â Â Â Â Â  During this interview, Marko said he had had vaginal and anal intercourse with the victim, which he described as âangry sex.â The detective asked Marko what the victimâs father would say he had done to her, and Marko replied â[r]ape, murder, or attempted murder.â The detective asked him why he said rape, and he said it was because they had had sex, although he denied that he had raped her. When confronted with the fact that he initially had lied about knowing the victim, he said, âI was trying to cover my tracks.â He also told the detective about his black raptor beliefs.

 Â¶50Â Â Â Â Â Â Â Â  When the interview ended, Marko again remained on base. He was released from the seventy-two-hour hold and placed on a âbuddy watch,â which meant that he was free to move about the base but had to be accompanied by other soldiers. The sheriffâs officers did not request this restriction.

 Â¶51Â Â Â Â Â Â Â Â  On October 13, Marko agreed to go to the sheriffâs office for another interview. Another sheriffâs detective interviewed him, and he eventually confessed that he had knocked the victim unconscious at some point, had had sex with her, and had killed her. Marko showed sheriffâs officers the location of the victimâsÂ body, and the interview continued for about another hour after they returned to the station.

 Â¶52Â Â Â Â Â Â Â Â  Defense counsel filed multiple pretrial motions to suppress, on various grounds, all the statements Marko made to the police during the interviews and the evidence derived from those statements, as well as the evidence seized during the search of his barracks room. After holding a suppression hearing, the trial court issued a comprehensive order denying the motions to suppress.

 A. Custody Determination

 Â¶53Â Â Â Â Â Â Â Â  Marko argues that the trial court erroneously concluded that he was not âin custodyâ during the portion of the October 11 interview with the sheriffâs officers that occurred before he was advised of his Miranda rights, and thus the court erred in denying his motion to suppress the statements he made at that time. We conclude that Marko was not in custody during this portion of the interview.

 1. Law

 Â¶54Â Â Â Â Â Â Â Â  âTo protect a [defendantâs] Fifth Amendment right against self-incrimination, Miranda prohibits the prosecution from introducing in its case-in-chief any statement . . . procured by custodialÂ interrogation, unless the police precede their interrogation with [Miranda] warnings.â People v. Matheny, 46 P.3d 453, 462 (Colo. 2002) (citing Miranda, 384 U.S. at 444). The protections of Miranda apply only if a defendant is subject to both custody and interrogation. Mumford v. People, 2012 CO 2, Â¶12. The only issue on appeal is whether Marko was in custody.

 Â¶55Â Â Â Â Â Â Â Â  A custody determination presents mixed questions of law and fact. Matheny, 46 P.3d at 462. We defer to the trial courtâs findings of historical fact if they are supported by competent evidence in the record. Id. However, we review de novo the legal question of whether the facts, taken together, establish that a defendant was in custody for Miranda purposes. People v. Elmarr, 181 P.3d 1157, 1161 (Colo. 2008).

 Â¶56Â Â Â Â Â Â Â Â  âThe fundamental inquiry in determining whether [a defendant was] in custody for purposes of Miranda is whether a reasonable person in the [defendantâs] position would [have] believe[d] himself to be deprived of his freedom of action to the degree associated with a formal arrest.â Mumford, Â¶13 (internal quotation marks omitted). âThis is an objective inquiry made on a case-by-case basis in light ofÂ the totality of the circumstances.â People v. Null, 233 P.3d 670, 676 (Colo. 2010).

 Â¶57Â Â Â Â Â Â Â Â  There is no exclusive list of factors to apply in determining whether a defendant was in custody. Mumford, Â¶14. Some of the factors a court should consider include:

 (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officerâs tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officerâs response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendantâs verbal or nonverbal response to such directions.

 Id. at Â¶13.

 Â¶58Â Â Â Â Â Â Â Â  Because none of these factors is determinative, id. at Â¶14, âa police interrogation at a stationhouse does not necessarily render the interrogation custodial for purposes of the Miranda warning,â Matheny, 46 P.3d at 466 (internal quotation marks omitted). Rather, all the circumstances surrounding the interrogation mustÂ be considered to determine whether the situation implicates the concerns behind Miranda. See id. at 463.

 2. Application

 a. Facts

 Â¶59Â Â Â Â Â Â Â Â  The following facts inform our analysis of the custody issue:

 
 At 12:23 a.m. on October 11, two MPs and a sergeant went to Markoâs barracks room and asked him to come downstairs to the parking lot where their military patrol car was parked to discuss whether he knew the victim. The MPs conducted a pat-down search of Marko to check for weapons.

 
 Marko maintained that he did not know the victim even after the MPs told him that they had contrary information.

 
 After escorting Marko back upstairs, the MPs indicated that they needed to search his room. One asked, âDo you mind?â and there is no evidence that Marko objected. The MPs performed a quick search of the room, during which Marko stood at the door with the sergeant. The MPs left at around 12:45 a.m.

 
 Â At around 2:20 a.m., two MPs returned to Markoâs barracks room and informed him that he needed to go to the military police station for questioning. He agreed.

 
 The MPs patted Marko down and handcuffed him. They escorted him downstairs and placed him in the back of a military police vehicle.

 
 Marko asked if he was under arrest, and one of the MPs informed him, âno you are not . . . . this is just common practice.â The MP told Marko that the handcuffs were âfor safety and transport purposes.â

 
 At the military police station, the MPs took Marko in through a rear door that required a code for entry. They patted him down and escorted him to an interview room to meet with the sheriffâs officers at around 2:45 a.m.

 
 Both of the sheriffâs officers were armed and in uniform. In the interview room, Markoâs handcuffs were removed and he was asked to sit down.[3] The interview room was small with no windows and one door, which was kept closed (but not locked) during the interview.

 
 Only Marko and the two sheriffâs officers remained in the room. Marko and one officer sat at an interview table, and the other officer sat in between the table and the door. Marko left the room a couple of times for restroom breaks; the officers may have escorted him to the restroom and back.

 
 At the beginning of the interview, one of the sheriffâs officers told Marko that he was not under arrest and that he was free to go at any time. Marko said that he understood and that he was willing to speak with them. The officer testified at the suppression hearing that he made a conscious decision not to give Marko Miranda warnings or videotape the conversation at that point.

 
 The officer said they were investigating a missing person and named the victim. After the officer confronted Marko with the online messages between him and the victim, Marko admitted that they had exchanged messages. He denied that he had seen her recently.

 
 Â The sheriffâs officers continued to confront Marko with inconsistencies and information that contradicted his account. Several times, they indicated that they believed he was not telling the truth and told him that he needed to tell the truth.

 
 Marko ultimately admitted that he had had a sexual relationship with the victim and had agreed to meet her on October 10.

 
 Marko offered several different accounts of what occurred when he met the victim. One of the officers told him that footage from highway cameras could confirm whether these accounts were true. Marko eventually said that the victim had gotten into his car, they had driven around for a bit, and then he dropped her off at a vacant building.

 
 At this point, 3:26 a.m., after the interview had lasted for approximately forty minutes, one of the officers advised Marko of his Miranda rights. Marko indicated that he understood his rights and that he was willing to continue the interview.



 b. Analysis

 Â¶60Â Â Â Â Â Â Â Â  We conclude that Marko was not in custody for Miranda purposes during the pre-advisement portion of the October 11 interview.

 Â¶61Â Â Â Â Â Â Â Â  Although Marko was taken to the station in handcuffs, and arguably would have felt that, under the military command structure, he was under an order to go to the station, he was informed at the outset of the interview that he was not under arrest and was free to go at any time. â[T]he crucial consideration [under Miranda] is the degree of coercive restraint to which a reasonable citizen believes he is subject at the time of questioning.â People v. Breidenbach, 875 P.2d 879, 887 (Colo. 1994) (internal quotation marks omitted); see also Maryland v. Shatzer, 559 U.S. 98, 112 (2010) (addressing âthe danger of coercion that results from the interaction of custody and official interrogationâ (internal quotation marks and alteration omitted)).

 Â¶62Â Â Â Â Â Â Â Â  In Mumford, the supreme court addressed the significance of removing physical restraints before beginning interrogation. In that case, the police had warrants to search the defendantâs residence and to arrest his friend (who allegedly had been selling drugs fromÂ the residence). Id. at Â¶2. When the police officers arrived to execute the warrants, some of them had their guns drawn. Id. Afterwards, a detective interrogated the defendant outside his residence. Id. at Â¶6.

 Â¶63Â Â Â Â Â Â Â Â  While acknowledging that â[o]ne well-recognized circumstance tending to show custody is the degree of physical restraint used by police officers to detain a citizen,â the supreme court emphasized that the officersâ guns were drawn only briefly, the detective who questioned the defendant did not display a weapon while questioning him, and the defendant was not in handcuffs or subjected to any other sort of physical restraint while being questioned. Id. at Â¶17 (internal quotation marks omitted). Considering the other circumstances of the encounter, including that the detective was not aggressive or threatening and that there were no objective circumstances indicating that the police suspected the defendant of criminal activity until he made incriminating statements, the supreme court held that the defendant was not in custody. Id. at Â¶Â¶16, 18, 21.

 Â¶64Â Â Â Â Â Â Â Â  Similarly, the physical restraints imposed by the military here, while present before Marko was interrogated, were removed beforeÂ the interview. There also was no indication that the restraints were imposed because the sheriffâs officers suspected Marko of criminal activity.

 Â¶65Â Â Â Â Â Â Â Â  In Effland v. People, 240 P.3d 868, 874 (Colo. 2010), the defendant was interrogated by police at a hospital while he was at least partially immobilized in a hospital bed (he was attached to an intravenous line). Although the supreme court held that, under the totality of the circumstances, the defendant was in custody for Miranda purposes, it stated that facts that weighed against a finding of custody included that the defendant was not handcuffed or restrained by law enforcement officials and his âmobility was limited for medical reasons unrelated to police conduct.â Id. at 875. The supreme court thus relied on the restraints on the defendantâs freedom of movement that were imposed by law enforcement officials, not on the restraints outside of law enforcement officialsâ control, to conclude that a reasonable person in the defendantâs position would not have felt free to terminate the encounter. See id. at 876.

 Â¶66Â Â Â Â Â Â Â Â  Likewise, the objective circumstances here indicated that the physical restraints imposed on Marko were due to militaryÂ procedures and were unrelated to the sheriffâs officersâ conduct. And, Markoâs handcuffs were removed at the start of the interview, and the sheriffâs officers told him he was free to go. Consequently, a reasonable person in Markoâs position would not have felt that the imposition of the restraints was a tactic employed by the sheriffâs officers to âsubjugate the individual to the will of the examiner.â Miranda, 384 U.S. at 457. Rather, he would have believed that he was free to leave, despite the fact that he previously had been restrained.

 Â¶67Â Â Â Â Â Â Â Â  Moreover, Colorado cases have not treated as dispositive the fact that an interrogation occurs in a secure police station. For instance, in Matheny, 46 P.3d at 468, the supreme court concluded that âthe fact that the room where the [defendantâs] interview took place happened to be [in] a secure police station does not alter [the supreme courtâs] conclusionâ that the encounter was a âconsensual interview between [the] defendant and the police.â

 Â¶68Â Â Â Â Â Â Â Â  In reaching its conclusion, the supreme court emphasized that the defendant had been informed when he arrived at the police station that he was not under arrest and was free go to at any time; officers entered and exited the interview room; nothing in the recordÂ suggested that the defendant would not have been able to leave had he wanted to, and he did not express a desire to leave; the defendant gave his account largely in narrative form; the officers spoke softly and were polite; and they gave no directions to the defendant. Id. at 467.

 Â¶69Â Â Â Â Â Â Â Â  Many of the same factors are present here. For example, Marko never asked to return to the barracks, leave the station, or stop the conversation, and there is no indication in the record that had he made such a request, it would have gone unheeded. And although the sheriffâs officers confronted Marko with inconsistent details of his story, told him that they expected him to tell them the truth, and informed him that they could verify parts of his account through security camera footage, these statements were not made in an aggressive or accusatory manner. The tone of the interview was conversational.

 Â¶70Â Â Â Â Â Â Â Â  Under these circumstances, we conclude that a reasonable person in Markoâs position would not have believed himself or herself to be deprived of his or her freedom of action to the degree associated with a formal arrest.

 c. Other Considerations â Military Command Structure

 Â¶71Â Â Â Â Â Â Â Â  Marko relies on United States v. Rogers, 659 F.3d 74 (1st Cir. 2011), to argue that a reasonable person in his position would have felt compelled by the military chain of command to comply with the MPsâ demands and that, therefore, he was in custody.

 Â¶72Â Â Â Â Â Â Â Â  In Rogers, the defendant was a noncommissioned naval officer who worked at a naval base. Id. at 76. Civilian police authorities had obtained a warrant to search his residence based on suspicions that he possessed child pornography, and they planned to conduct the search when he was on duty at the base. Id. The civilian police coordinated with agents of the Naval Criminal Investigative Service (NCIS), who asked the defendantâs commanding officer to order him to report to them in the parking lot. Id. When he did so, they told him to go home. Id.

 Â¶73Â Â Â Â Â Â Â Â  When the defendant in Rogers arrived home, three police officers were inside, one of whom told him that he was not going to be arrested. Id. In response to questioning, the defendant made incriminating statements and eventually agreed to go to the police station for more formal questioning. Id.

 Â¶74Â Â Â Â Â Â Â Â  The First Circuit Court of Appeals held that the defendant was in custody, emphasizing that although he was informed that he would not be arrested, he was not advised that he was free to have nothing to do with the police officers while they were there. Id. at 77-78. It concluded that â[t]he most significant element in analyzing the situation [was] that the military had made certain that [the defendant] did not walk into it voluntarily, or confront the police with free choice to be where he was.â Id. at 78.

 Not only was he under a military order to be there at the time, but a reasonable person could not have doubted that the commanding officer had been aware of what was ahead and was purposely ordering his subordinate into the company of the police . . . . Nor was anything said or done at the house to relieve the force of the order; the state and local police lacked the authority [to countermand the order] and [the] NCIS officer . . . said nothing to [the defendant] while [at his house].

 Id.

 Â¶75Â Â Â Â Â Â Â Â  The court concluded that the military order therefore reasonably carried at least (and probably more than) subtle coercion to speak with the civilian police, and, accordingly, the defendantâs situation âwould have left any member of the armed services reasonably feeling that he lacked free choice to extricateÂ himself, and sufficiently compelled to answer to authority.â Id. at 78-79.

 Â¶76Â Â Â Â Â Â Â Â  We agree with the First Circuit that the influence of military authority plays a role in the custody inquiry. âIn the military . . . a suspect may be required to report and submit to questioning quite without regard to warrants or other legal processes. It ignores the realities of that situation to say that one ordered to appear for interrogation has not been significantly deprived of his freedom of action.â United States v. Shafer, 384 F. Supp. 486, 489-90 (N.D. Ohio 1974) (internal quotation marks omitted).

 Â¶77Â Â Â Â Â Â Â Â  However, deprivation of freedom of action is not the determinative factor in assessing custody for Miranda purposes; rather, the question is whether âa reasonable person in the [defendantâs] position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest.â Mumford, Â¶13 (emphasis added) (internal quotation marks committed). â[T]he freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody,â because âMiranda is to be enforced only in those types of situationsÂ in which the concerns that powered the decision are implicated.â Shatzer, 559 U.S. at 112 (internal quotation marks omitted).

 Â¶78Â Â Â Â Â Â Â Â  We thus do not interpret Rogers to hold that a soldier is in custody any time he or she is ordered to appear for interrogation by civilian police.[4] Such a rule would be inconsistent with the requirement that we evaluate custody under the totality of the circumstances, and that no one factor is determinative. Mumford, Â¶13.

 Â¶79Â Â Â Â Â Â Â Â  Other courts have similarly concluded that an order by a military superior to a subordinate to appear for questioning by civilian police does not conclusively establish that the subordinate was in custody for Miranda purposes. For instance, in Dean v. State, 665 S.E.2d 406, 410 (Ga. Ct. App. 2008), the Georgia Court of Appeals emphasized that although the defendant responded to aÂ general order from his superior in the Air Force to go to the baseâs investigations office for an interview with civilian police, the ârequest was made by Air Force personnel, not by the police officers. Any lack of discretion as to whether [the defendant] was free to disregard the order resulted from his position in the military, not from anything the police may have done.â The court concluded that the defendant was not in custody, explaining that when he was interviewed, only the civilian detective was present, and there was no evidence that the detective limited the defendantâs right to terminate the questioning and leave at any point. Id. at 409-10.

 Â¶80Â Â Â Â Â Â Â Â  In Fiedler v. State, 991 S.W.2d 70, 83 (Tex. App. 1998), the Texas Court of Appeals acknowledged that â[i]f the military and civilian authorities were working together, and [the defendant] was ordered by the military authorities to make a statement to the civilian authorities, [it] could be considered a custodial encounter.â However, in concluding that the defendant was not in custody for part of his interview with civilian police, the court stated that â[t]here is no evidence in the record . . . that the military was requiring [the defendant] to give a statement to civilian authorities.â Id.

 Â¶81Â Â Â Â Â Â Â Â  Similarly, because there were no objective circumstances indicating that the military was working with, or imposing restraints at the request of, the sheriffâs officers, a reasonable person in Markoâs position would not have believed that, because of the restraints, the âquestioning [would] continue until [he] provide[d] his interrogators the answers they [sought].â Berkemer v. McCarty, 468 U.S. 420, 438 (1984).

 Â¶82Â Â Â Â Â Â Â Â  Our conclusion also finds support in cases concerning prisoner interrogations. The United States Supreme Court has explained that whether the fact of incarceration means that a defendant is in custody for Miranda purposes depends on âwhether it exerts the coercive pressure that Miranda was designed to guard against,â Shatzer, 559 U.S. at 112, and thus âimprisonment alone is not enough to create a custodial situation within the meaning of Miranda,â Howes v. Fields, 565 U.S. ___, ___, 132 S. Ct. 1181, 1190 (2012). Other courts, including the Colorado Supreme Court, have held that âa person under detention or incarcerated for unrelated purposes is not necessarily subjected to a âcustodial interrogationâ solely because he or she was questioned while so detained.â People v. J.D., 989 P.2d 762, 768 (Colo. 1999).

 Â¶83Â Â Â Â Â Â Â Â  Rather, to determine whether a defendant interrogated in prison was in custody, courts have examined whether there was a ââchange in the surroundings of the prisoner which result[ed] in an added imposition on his freedom of movement.ââ United States v. Conley, 779 F.2d 970, 973 (4th Cir. 1985) (quoting Cervantes v. Walker, 589 F.2d 424, 428 (9th Cir. 1978)); see also People v. Denison, 918 P.2d 1114, 1116-17 (Colo. 1996) (collecting cases). The relevant inquiry is whether, under the totality of the circumstances, âthe inmate was subjected to more than the usual restraint on a prisonerâs liberty.â Conley, 779 F.2d at 973; see also J.D., 989 P.2d at 768 (discussing the factors that must be applied to determine whether an inmate has been restricted to the extent that he or she is âin custodyâ for Miranda purposes).

 Â¶84Â Â Â Â Â Â Â Â  Marko was subject to restraint on his freedom of movement by virtue of his position in the military. However, nothing in the record indicates that the coercive influence of the military command structure combined with the authority of the sheriffâs officers to such a degree that a reasonable person in Markoâs position would have felt that his freedom of movement was more restrained than that of other military personnel. Consequently, the circumstancesÂ of the initial portion of the October 11 interview would not have caused a reasonable person in Markoâs position to believe that he or she was deprived of his or her freedom of movement to a degree associated with a formal arrest.

 Â¶85Â Â Â Â Â Â Â Â  For all these reasons, the trial court did not err in concluding that Marko was not in custody for the pre-advisement portion of the October 11 interview.

 B. Invocation of Right to Silence

 Â¶86Â Â Â Â Â Â Â Â  On the morning of October 11, Marko took the sheriffâs officers to the location where, under Markoâs version of events at that point, the victim had fallen off a cliff. Marko was then taken back to the military police station and the interview with the detective resumed.

 Â¶87Â Â Â Â Â Â Â Â  At the beginning of this portion of the interview, the first thing Marko said to the detective was, âI want to go home.â The detective replied, âI donât blame you. I want to go home too,â and proceeded to continue questioning Marko.

 Â¶88Â Â Â Â Â Â Â Â  The trial court concluded that Marko did not invoke his right to remain silent:

 [Markoâs] statement clearly indicates that he is tired of being interviewed. It is not however an unequivocal election to terminate theÂ interview. . . . [Marko] could have told [the detective] that he wanted to stop; he did not. This equivocal statement on [Markoâs] part does not constitute invocation of his Miranda rights.

 Â¶89Â Â Â Â Â Â Â Â  Marko argues that the court erred in concluding that he did not invoke his right to remain silent, and thus it erred in denying his motion to suppress all statements he later made. We disagree.

 Â¶90Â Â Â Â Â Â Â Â  Whether a defendant invoked his or her right to silence during custodial interrogation is a mixed question of law and fact. People v. Arroya, 998 P.2d 1124, 1129 (Colo. 1999). â[W]e defer to the factual findings of the court so long as there is sufficient evidence in the record to support the findings, but we subject [its] legal conclusions to de novo review.â Id.

 Â¶91Â Â Â Â Â Â Â Â  Under Miranda, if a suspect who is subject to custodial interrogation âindicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.â Miranda, 384 U.S. at 473-74.[5] âOnce aÂ criminal suspect invokes his right to remain silent, the police must âscrupulously honorâ the assertion of this right . . . . âThe critical safeguard . . . is a personâs âright to cut off questioning.âââ Arroya, 988 P.2d at 1130 (quoting Michigan v. Mosley, 423 U.S. 96, 103-04 (1975)).

 Â¶92Â Â Â Â Â Â Â Â  âHowever, Miranda does not require the police to accept as conclusive any statement, no matter how ambiguous, as a sign that the suspect desires to cut off questioning.â People v. Gray, 975 P.2d 1124, 1130 (Colo. App. 1997). Rather, âa suspect must clearly articulate the desire to remain silent so that a reasonable police officer in the circumstances would understand the suspectâs words and conduct to mean that the suspect is asserting her Miranda right to cut off questioning.â Arroya, 988 P.2d at 1129-30.

 Â¶93Â Â Â Â Â Â Â Â  A suspect is not required to use special or ritualistic phrases to invoke the right to cut off questioning. Id. at 1132. To determine whether a suspectâs statement is a clear assertion of the right, a court must consider the totality of the circumstances surrounding it. Id. Factors the court should consider include:

 The words spoken by the [suspect] and the interrogating officer, the officerâs response to the suspectâs words, the speech patterns of theÂ suspect, the content of the interrogation, the demeanor and tone of the interrogating officer, the suspectâs behavior during questioning, the point at which the suspect invoked the right to remain silent, and who was present during the interrogation.

 Id. A court may also take into account a suspectâs experience with the criminal justice system and his or her ability to understand questioning and verbalize his or her wants and needs. Id. at 1133. The above factors are not exhaustive and no single factor is controlling. Id.

 Â¶94Â Â Â Â Â Â Â Â  In People v. Muniz, 190 P.3d 774, 783 (Colo. App. 2008), a division of this court held that a defendant did not invoke his right to remain silent when he said, âI just want to go home,â during a police interrogation. The statement was made about one hour after the defendant was advised of his Miranda rights, and throughout the questioning the detective represented to the defendant that he could go home at the end of the questioning. Id. The defendant said:

 Well, this . . . letâs do this. To end this interview, give me my blood test, and let me go, or . . . or . . . or whatever youâre going to do. . . . [Y]ouâre not going to tell me what I want to know, and Iâm not going to tell you. . . . Oh, I just want to go home. ThatâsÂ what I want. I want to know can you take my blood test, or whatever you want to do, or . . . .

 Id.

 Â¶95Â Â Â Â Â Â Â Â  The division concluded that the trial court did not abuse its discretion in denying the defendantâs motion to suppress because âa reasonable police officer could have understood the statements at issue as an expression of [the] defendantâs desire to go home promptly, rather than as invocation of his right to remain silent.â Id. at 784.

 Â¶96Â Â Â Â Â Â Â Â  We agree with the trial court that, as in Muniz, a reasonable police officer would not have interpreted Markoâs statement that he wanted to go home as a clear assertion of his right to cut off questioning. The plain language of Markoâs statement does not show any desire to assert his right to silence or to end the interview. Nor do the other circumstances surrounding the statement indicate that Marko was attempting to invoke his right to cut off questioning rather than merely expressing his fatigue, especially considering that the interview had lasted almost seven hours at that point and Marko had just gotten back from accompanying the police to look for the victimâs body.

 Â¶97Â Â Â Â Â Â Â Â  Accordingly, Marko did not invoke his right to silence, and the trial court did not err in denying his motion to suppress on that basis.

 C. Invocation of Right to Counsel

 Â¶98Â Â Â Â Â Â Â Â  On October 13, sheriffâs officers contacted an army Criminal Investigation Division (CID) agent who was involved in the case and asked her to bring Marko to CID headquarters to meet with them. Military personnel transported Marko to the CID office. A sheriffâs detective asked Marko whether he would be willing to go to the sheriffâs office for another interview. Marko agreed.

 Â¶99Â Â Â Â Â Â Â Â  The sheriffâs officers transported Marko to the sheriffâs office in an unmarked police car. Marko sat in the front seat of the car and was not restrained in any way.

 Â¶100Â Â Â Â Â Â Â Â  When they arrived at the sheriffâs office, Marko was shown into an interview room. The detective explained to Marko about a âtruth verification examination,â which is essentially a lie detector test. The detective asked Marko if he would be âwilling to do that.â Marko responded, âsure.â

 Â¶101Â Â Â Â Â Â Â Â  The detective presented Marko with a truth verification release form, which he asked him to read and sign. Marko did so. TheÂ detective then provided Marko with more details about the exam, which included that the device used a microphone that would be connected by a wire to Markoâs shirt. The detective said that because Marko would be attached to the device by the wire, he âmay not feel free to leaveâ or he may feel under arrest.

 Â¶102Â Â Â Â Â Â Â Â  The detective emphasized that Marko was not under arrest, but because he might not feel free to leave, the detective had to advise him of his constitutional protections.

 Â¶103Â Â Â Â Â Â Â Â  The detective then read Marko a Miranda advisement. The advisement informed Marko that he had âthe right to talk to a lawyer and have him present . . . while . . . being questioned,â and he âcould also have a lawyer prior to questioning, after questioning, during questioning, or any phase actually.â The detective ended the advisement with a statement that Marko could decide at any time to exercise these rights and not to answer any questions, and he could choose at any time to simply stop taking the exam. The detective gave Marko a form and told him to initial it if he was willing to proceed with the exam. The following exchange occurred:

 [Marko]: I wonât be able to have a lawyer until Tuesday; thatâs the problem.

 [Detective]: If you want to wait, we certainly could. If you want to invoke your right, we can certainly do that if you â

 [Marko]: Can [or âcouldâ] I have a lawyer?

 [Detective]: Yup, or if youâre comfortable at least talking to me, we can proceed and if at any time you want to stop, you feel like youâre in dangerous territory, you certainly can do that too.

 [Marko]: I can talk, but I want to talk with a lawyer when the machine is present.

 [Detective]: Okay, so what Iâm hearing from you is that you donât want to proceed with the lie detector today but youâre willing to talk to us without an attorney present â

 [Marko]: Yes.[Detective]: â is that what I hear?

 [Marko] Yes.

 [Detective]: Do you mind at least talking to me, then, today and seeing where it goes?

 [Marko]: Yeah, I can talk to you today and stuff, about the shit that was confiscated and stuff, about when I can get that shit back.

 [Detective]: Okay.

 Â¶104Â Â Â Â Â Â Â Â  Marko mentioned the items that the police apparently had confiscated and explained that he needed some of them returned.

 [Detective]: Okay. So youâre comfortable talking with me, youâre just not comfortable taking the exam?

 [Marko]: Yes.

 [Detective]: Is that what Iâm hearing from you?

 [Marko]: Yes.

 [Detective]: Okay. Can I get your signature on that either way?

 Â¶105Â Â Â Â Â Â Â Â  Marko then initialed a written Miranda warning indicating that he understood his rights and was willing to speak with the detective. The detective did not administer the truth verification exam, but he continued to interview Marko. Marko eventually confessed to killing the victim.

 Â¶106Â Â Â Â Â Â Â Â  The trial court concluded that Marko did not invoke his right to counsel. It found that Marko had indicated he would take the truth verification exam only if he had an attorney present, but that âhe clearly confirmed that he didnât need an attorney if [the detective] was not going to utilize the test.â

 Â¶107Â Â Â Â Â Â Â Â  Marko argues that his statements constituted an invocation of his right to counsel and thus the trial court erred in denying his motion to suppress all statements he later made. We disagree.

 Â¶108Â Â Â Â Â Â Â Â  Whether a defendant invoked his or her right to counsel during a custodial interrogation is a mixed question of law and fact. People v. Romero, 953 P.2d 550, 555 (Colo. 1998).

 Â¶109Â Â Â Â Â Â Â Â  âThe Fifth Amendment privilege against self-incrimination includes the right to have a lawyer present during custodial interrogation.â Id. at 553 (citing Miranda, 384 U.S. at 470). Once a suspect indicates in any manner that he or she wants the assistance of an attorney, all police-initiated interrogation must cease until the suspect has consulted with an attorney. Id.; People v. Adkins, 113 P.3d 788, 791 (Colo. 2005).

 Â¶110Â Â Â Â Â Â Â Â  Whether a suspect has invoked the right to counsel during custodial interrogation depends on whether his or her statements âcan reasonably be construed to be an expression of a desire for the assistance of an attorney.â Romero, 953 P.2d at 554 (emphasis omitted) (internal quotation marks omitted). An ambiguous or equivocal reference to an attorney does not require the police to cease questioning. Id. at 555. A statement is ambiguous if it gives rise to opposing inferences. Id. at 554.

 Â¶111Â Â Â Â Â Â Â Â  A statement reflecting a desire for counsel is not ambiguous if it âput[s] the officers on notice that the [suspect] intend[s] toÂ exercise his right to counsel and his right against self-incrimination.â Adkins, 113 P.3d at 792 (internal quotation marks omitted). âIf the desire for counsel is presented sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney, no ambiguity or equivocation exists, and all questioning must cease.â Romero, 953 P.2d at 554 (emphasis omitted) (internal quotation marks omitted).

 Â¶112Â Â Â Â Â Â Â Â  If a suspectâs statements are ambiguous, police are allowed a limited inquiry for the sole purpose of determining if an attorney has been requested. People v. Bradshaw, 156 P.3d 452, 458 (Colo. 2007); see also People v. Kleber, 859 P.2d 1361, 1364 (Colo. 1993).

 Â¶113Â Â Â Â Â Â Â Â  To determine whether a suspect made a sufficiently clear expression of his or her desire for counsel, a court must consider the totality of the circumstances. Romero, 953 P.2d at 555. The factors a court should consider are the same as those to be considered in determining whether a suspect invoked his or her right to silence, as well as the suspectâs youth, background, nervousness or distress, and feelings of intimidation orÂ powerlessness. People v. Lynn, 2012 CO 45, Â¶7; see also Romero, 953 P.2d at 555-56.

 Â¶114Â Â Â Â Â Â Â Â  In Adkins, 113 P.3d at 790, the defendant interrupted the interrogating detectiveâs Miranda advisement after the detective had read: âYou have the right to speak with an attorney and have him present with you during questioning.â The defendant asked, â[w]hy donât I have [a lawyer] nowâ? Id. After the detective finished reading the advisement, the defendant again asked, â[h]ow come I donât have a lawyer right nowâ? Id. The supreme court held that the defendant âmade an unambiguous and unequivocal request for counsel during interrogation,â emphasizing the timing of the defendantâs request: âIf a defendant is going to invoke the right to counsel, we cannot imagine a time more obvious than . . . as soon as the defendant was informed of the right.â Id. at 791, 793.

 Â¶115Â Â Â Â Â Â Â Â  Marko argues that the fact that his statements similarly were made during or in response to the Miranda advisement demonstrates that they constituted an unambiguous request for counsel. However, the entire context of the statements must be considered. See People v. Grenier, 200 P.3d 1062, 1071 (Colo. App. 2008). We believe that the circumstances here are more analogousÂ to those in People v. Aryee, 2014 COA 94, Â¶24, in which the defendant referenced a lawyer during a discussion about his willingness to provide a DNA sample:

 [Detective]: Would you be willing to give me a sample of your DNA? Do you know what DNA is?

 [Defendant]: Yeah. [Detective]: Okay.

 [Defendant]: But until I talk to my lawyer, if I can talk to my lawyer.

 The division concluded that it was unclear whether the defendant was requesting an attorney at that time or whether he only wanted to speak to one before giving a DNA sample, and thus the statement was ambiguous. Id. at Â¶27.

 Â¶116Â Â Â Â Â Â Â Â  Similarly, Marko was given a Miranda advisement while the detective was discussing the truth verification exam. Under the circumstances, a reasonable police officer could have interpreted Markoâs statement that he would not have a lawyer âuntil Tuesdayâ as either expressing the desire for an attorneyâs presence while taking the exam or as indicating that he wanted to speak with an attorney immediately. His statement and his follow-up questionÂ regarding whether he could have a lawyer were therefore ambiguous. See Romero, 953 P.2d at 555. Consequently, the detective was permitted to ask questions to determine whether Marko was willing to continue the current interview without an attorney present. See Bradshaw, 156 P.3d at 458.

 Â¶117Â Â Â Â Â Â Â Â  Marko argues that his responses to these questions unambiguously established that he would talk to the detective without an attorney only about his seized possessions, and thus he invoked his right to counsel regarding any other interrogation topic. We disagree that Markoâs responses were unambiguous in this respect; rather, we believe they reasonably could be interpreted as indicating his willingness to speak to the detective on any issue without an attorney present (unless a truth verification exam was going to be administered).

 Â¶118Â Â Â Â Â Â Â Â  Accordingly, Marko did not invoke his right to counsel, and the trial court did not err in denying his motion to suppress on that basis.

 D. Voluntariness

 Â¶119Â Â Â Â Â Â Â Â  Marko argues that the trial court erred in concluding that the statements he made to sheriffâs officers during the interviews onÂ October 11, 12, and 13 were voluntary. He thus argues that, even if there were no Miranda violations, the trial court erred in denying his motions to suppress. We disagree.

 1. Law

 Â¶120Â Â Â Â Â Â Â Â  The state bears the burden of establishing the voluntariness of a defendantâs statement by a preponderance of the evidence. Effland, 240 P.3d at 878. We uphold a trial courtâs findings of fact on the voluntariness of a statement if they are âsupported by adequate evidence in the record.â Id. However, the ultimate determination of whether a statement is voluntary is a legal question that we review de novo. Id.

 Â¶121Â Â Â Â Â Â Â Â  The Due Process Clauses of the Fourteenth Amendment and the Colorado Constitution forbid the use of a defendantâs involuntary statement in a criminal prosecution. Jackson v. Denno, 378 U.S. 368, 376 (1964); Effland, 240 P.3d at 877. âA confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in inducing the statement.â Effland, 240 P.3d at 877. Coercive conduct includes not only physical abuse or threats but also subtle forms of psychological coercion. Id.

 Â¶122Â Â Â Â Â Â Â Â  Conversely, a statement is voluntary if it is âthe product of an essentially free and unconstrained choice by its maker.â Id. (internal quotation marks omitted).

 Â¶123Â Â Â Â Â Â Â Â  Whether a statement is voluntary must be evaluated under the totality of the circumstances. Id. Factors to consider include:

 Whether the defendant was in custody or was free to leave and was aware of his situation; whether Miranda warnings were given prior to any interrogation and whether the defendant understood and waived his Miranda rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendantâs mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system.

 Id. at 877-88.

 2. Application

 a. October 11 Statements

 Â¶124Â Â Â Â Â Â Â Â  Marko argues that the statements he made on October 11 were involuntary because, among other things:

 
 before being ordered to go to the military police station, he had already been subjected to questioning by MPs and his barracks room had been searched;

 
 he was ordered by military superiors to go with MPs in a military police vehicle to the station and submit to questioning;

 
 he was not given the option of driving himself and he was not told that the sheriffâs officers had the authority to override the military command structure and countermand the order that he immediately go to the military police station and submit to questioning;

 
 the two sheriffâs officers who initially interviewed him deliberately failed to advise him of his rights;

 
 although he was visibly tired, the officers made no effort to ascertain his level of fatigue, even after knowing he had been awake at least twenty-four hours;

 
 Â the sheriffâs officers suspected he was involved in the victimâs disappearance, constantly told him that they did not believe his statements about the victim and his encounter with her, made false statements to him about their ability to verify his assertions, and made false statements about evidence they allegedly had; and

 
 the method and style employed by the officers was intimidating and coercive, and their tone was confrontational and accusatory.



 Â¶125Â Â Â Â Â Â Â Â  The record does not support several of these assertions. For instance, although it is undisputed that Marko was essentially ordered to go to the military police station by his military commanders, the trial court specifically found that there was no evidence that anyone in the military had ordered Marko to speak with the sheriffâs officers. The trial court also found that the interview was conversational at all times; the sheriffâs officers never made specific threats or demands, or promised Marko anything in return for his conversation; and although they were insistent that his story was hard to believe, they told him that they were not accusing him of anything. The record supports these findings.

 Â¶126Â Â Â Â Â Â Â Â  Moreover, although one of the officers testified that he consciously decided not to give Marko Miranda warnings initially, he testified that he did so because he did not believe Marko was in custody at that time. Marko does not point to any evidence that indicates the decision was a deliberate ploy to circumvent his rights, and the trial court found no such ploy. The court also found that Marko was properly given a Miranda advisement on at least two occasions and agreed to waive those rights.

 b. October 12 Statements

 Â¶127Â Â Â Â Â Â Â Â  To support his argument that his statements to the sheriffâs detective on October 12 were not voluntary, Marko asserts:

 
 his military supervisors had not allowed him to leave the military police station and had informed him that he was in custody on a seventy-two-hour hold;

 
 the detective told him that the detective had no power to countermand orders of his military superiors;

 
 he was not wearing shoes;

 
 the tone of the interrogation was confrontational and accusatory; and

 
 the detective had learned about his mental health issues, and he had told him about his black raptor beliefs.



 c. October 13 Statements

 Â¶128Â Â Â Â Â Â Â Â  Marko argues that his statements to the other sheriffâs detective on October 13 were also involuntary for the following reasons:

 
 he was under âbuddy watchâ on the base;

 
 he was patted down and transported to the sheriffâs office in a police vehicle to take a lie detector test;

 
 he was brought into the station through a side door not open to the general public which required an entry card to open, and he was taken to a small, interior room;

 
 during the interrogation, the detective was seated so as to block the only means of exit;

 
 when he indicated he was only willing to talk about his personal belongings, the detective told him he had bigger worries than getting his possessions back;

 
 the interrogation was confrontational, with the detective confronting him about his history of lies and the detectiveâsÂ belief that he had not told the truth regarding the victimâs disappearance; and

 
 the detective discussed the military tradition of not leaving a downed comrade behind and told him that an honorable soldier would not leave a person behind or cause that personâs family to wonder what became of her.



 d. Analysis

 Â¶129Â Â Â Â Â Â Â Â  â[C]oercive government conduct is a necessary predicate to the finding that a confession is not voluntary.â Effland, 240 P.3d at 877 (internal quotation marks omitted). Even if coercive conduct is found, the conduct must have âplayed a significant role in inducing the statements.â People v. Valdez, 969 P.2d 208, 212 (Colo. 1998). Here, the totality of the circumstances surrounding the interviews does not demonstrate that the officersâ conduct was coercive, much less that coercive conduct played a significant role in inducing Markoâs statements.

 Â¶130Â Â Â Â Â Â Â Â  While Marko was clearly fatigued at times, there is no evidence that the police officers prevented him from sleeping as a means of coercion. See id. at 213 (âAbsent evidence that the officers deprived [the defendant] of food and rest as a means of physical punishment,Â the fact that [he] happened to be hungry and tired does not support a conclusion that his statements were involuntary.â). Although the interview on October 11 lasted for about twelve or thirteen hours, one of the police officers testified that he believed it was critical to keep interviewing Marko because at that point the police believed that the victim might still be alive.

 Â¶131Â Â Â Â Â Â Â Â  The trial court found that it was objectively reasonable for the interview to continue because the victim had not yet been located, and the officers were legitimately concerned about finding her. Additionally, Marko appeared willing to continue the interview despite his fatigue and never attempted to terminate the interview, other than his statement that he wanted to go home. Marko also was left alone during numerous breaks, some of which lasted for thirty or forty-five minutes, during which he slept on and off.

 Â¶132Â Â Â Â Â Â Â Â  That the sheriffâs officers at times may have indicated that they did not believe Markoâs account or admonished him to tell the truth also does not establish coercion, especially because Marko had lied about knowing the victim and seeing her the day she disappeared. The supreme court has held that âthe mere fact that a polygraph examiner told a defendant that in his opinion there hadÂ been some deception by the defendant in his examination was not, considering the totality of the circumstances, enough to make his statement involuntary.â People v. Miranda-Olivas, 41 P.3d 658, 663 (Colo. 2001) (internal quotation marks omitted). Moreover, âcourts in other jurisdictions have held that police encouragement to a defendant to tell the truth does not amount to coercion.â Id. And importantly, nothing in the record indicates that the officers made specific threats against Marko if he did not tell the truth or promised him anything for being truthful.

 Â¶133Â Â Â Â Â Â Â Â  To the extent the record supports Markoâs assertion that the sheriffâs officers misrepresented what they knew about the case (for example, telling him that they found the victimâs blood on his shirt before DNA analysis was completed), âfalse representations regarding the extent of the [policeâs] knowledge and evidence of the defendantâs participationâ in the offense will not, standing alone, render a confession involuntary. People v. Freeman, 668 P.2d 1371, 1380 (Colo. 1983); see also People v. Cooper, 731 P.2d 781, 784 (Colo. App. 1986). Rather, this factor must be considered within the totality of the circumstances. Freeman, 668 P.2d at 1380. Nothing in the record indicates that any false representations by theÂ police played a significant role in causing Marko to confess to the murder. See People v. Bostic, 148 P.3d 250, 257-58 (Colo. App. 2006).

 Â¶134Â Â Â Â Â Â Â Â  We thus conclude that Markoâs will was not overborne by the conduct of the police such that his statements were involuntary. See Dickerson v. United States, 530 U.S. 428, 434 (2000). Accordingly, the trial court did not err in denying Markoâs motions to suppress on that basis.

 E. Search of Markoâs Barracks Room

 1. Facts

 Â¶135Â Â Â Â Â Â Â Â  At around 4:30 a.m. on October 11, another sheriffâs detective was dispatched to the base. The sheriffâs officers who were already involved in the case briefed him, and he watched some of the video recording of the interview with Marko. He then prepared a search warrant for Markoâs barracks room.

 Â¶136Â Â Â Â Â Â Â Â  Because the base is under exclusive federal military jurisdiction, the detective contacted the CID agent who was involved in the investigation. The CID agent, with the detective present, called an army major who was a deputy staff judge advocateÂ assigned to one of the units on the base and who had been appointed as a part-time military magistrate.

 Â¶137Â Â Â Â Â Â Â Â  Over the phone, the detective explained to the magistrate the circumstances of the case and described the contents of the warrant he had prepared. The magistrate administered an oath to the detective.[6] The CID agent then read to the magistrate the probable cause statement contained in the affidavit attached to the warrant. The warrant and its attachments were not read verbatim. The magistrate said that he believed probable cause supported the warrant, and he authorized the search. The CID agent annotated a copy of the warrant to indicate it had been orally authorized by the magistrate.

 Â¶138Â Â Â Â Â Â Â Â  When the detective and the CID agent arrived at the barracks, they discovered that the search warrant contained the wrong room number for Markoâs room. The CID agent again called the magistrate, who orally authorized her to make a pen and inkÂ change to the warrant to reflect the correct room. The detective and the CID agent then executed the warrant and seized several inculpatory items, including the knife and the shirt with the victimâs blood on it.

 Â¶139Â Â Â Â Â Â Â Â  Approximately three days later, the detective provided the magistrate with the printed warrant and a list of the items that had been seized during the search. The magistrate then administered another oath to the detective and signed the warrant.

 Â¶140Â Â Â Â Â Â Â Â  The magistrate testified at the suppression hearing that the information contained in the warrant was consistent with the information with which he had been provided over the phone, although there were a few additional details in the document that he did not remember being told during the phone conversation.

 Â¶141Â Â Â Â Â Â Â Â  Other testimony at the suppression hearing included testimony by the CID agent that a search warrant signed by a state judge or magistrate would not be effective to authorize a search on a military base under exclusive federal jurisdiction. The magistrate also testified that if a civilian law enforcement agency wanted to conduct a search on a military base, the typical protocol was to go through the Judge Advocate Generalâs office and obtainÂ authorization from a military judge, his or her assigned military magistrate, or an army commander.

 Â¶142Â Â Â Â Â Â Â Â  The trial court found that the procedure followed satisfied military law and procedure, and it therefore concluded that the warrant was valid under Colorado law.

 2. Law and Application

 Â¶143Â Â Â Â Â Â Â Â  Marko argues that the trial court erred in not suppressing the evidence obtained from the search of his barracks room because the search was not conducted pursuant to a valid search warrant. We disagree.

 Â¶144Â Â Â Â Â Â Â Â  The trial courtâs ruling on the motion to suppress presents a mixed question of fact and law. See People v. Martinez, 165 P.3d 907, 909 (Colo. App. 2007).

 Â¶145Â Â Â Â Â Â Â Â  The United States and Colorado Constitutions both establish the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV; Colo. Const. art. II, Â§ 7. To comply with the reasonableness requirement, the United States and Colorado Constitutions generally require a police officer to obtain a warrant before conducting a search. People v. King, 292 P.3d 959, 961 (Colo. App. 2011). A search warrant is valid only if issued by aÂ neutral and detached magistrate. People v. Trujillo, 712 P.2d 1079, 1080 (Colo. App. 1985). In Colorado, â[a] search warrant . . . may be issued by any judge of a court of record.â Â§ 16-3-301(1), C.R.S. 2015.

 Â¶146Â Â Â Â Â Â Â Â  âBoth the United States and Colorado Constitutions prohibit the issuance of a search warrant except upon a showing of probable cause supported by oath or affirmation.â People v. Pacheco, 175 P.3d 91, 94 (Colo. 2006). However, the Colorado Constitution is more restrictive than the United States Constitution because it provides that probable cause must be âsupported by oath or affirmation reduced to writing.â Hernandez v. People, 153 Colo. 316, 321, 386 P.2d 996, 999 (1963).

 Â¶147Â Â Â Â Â Â Â Â  Marko argues, first, that the search of his barracks room was not conducted pursuant to a valid warrant because a military magistrate is not a judge of a Colorado court of record, which he contends section 16-3-301 requires. Second, he argues that the warrant was invalid under the Colorado Constitution because it was not issued upon probable cause supported by oath or affirmation âreduced to writing.â

 Â¶148Â Â Â Â Â Â Â Â  We disagree with Marko that, under section 16-3-301, evidence seized pursuant to a warrant is admissible in a Colorado court only if the warrant was issued by a judge of a Colorado court of record. Rather, the statute, which governs the issuance of search warrants by Colorado courts, provides only that a search warrant âmay be issued by any judge of a court of record.â Â§ 16-3-301(1). Nothing in the plain language of the statute precludes the introduction in a Colorado criminal trial of evidence constitutionally seized under a search warrant issued by a âdetached and neutral magistrateâ from another jurisdiction. We thus reject Markoâs argument that the warrant did not comply with Colorado statutory requirements.

 Â¶149Â Â Â Â Â Â Â Â  Regarding Markoâs argument that the warrant violated the Colorado Constitution (and to the extent that he argues it also violated the United States Constitution), we conclude that we need not decide this issue because any such violation does not require suppression under the exclusionary rule.

 Â¶150Â Â Â Â Â Â Â Â  âExclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search.â Davis v. United States, 564 U.S. ___, ___, 131 S. Ct. 2419,Â 2426 (2011) (internal quotation marks omitted). Rather, the exclusionary rule is a judicially created doctrine whose sole purpose is to deter future Fourth Amendment violations. Id. The Colorado Supreme Court has explained that â[t]he exclusionary rule seeks to deter improper police conduct and should not be applied in cases where this deterrence purpose is not served.â People v. Kazmierski, 25 P.3d 1207, 1213 (Colo. 2001); see also Davis, 564 U.S. at ___, 131 S. Ct. at 2426-27 (âWhere suppression fails to yield appreciable deterrence, exclusion is clearly . . . unwarranted.â (internal quotation marks omitted)).

 Â¶151Â Â Â Â Â Â Â Â  When law enforcement officers act with an objectively reasonable good faith belief that their conduct is lawful, âthe deterrence rationale loses much of its force.â Davis, 564 U.S. at ___, 131 S. Ct. at 2427-28 (internal quotation marks omitted). Consequently, the exclusionary rule does not apply when the police conduct a search in objectively reasonable reliance on a warrant later held invalid. Id. at ___, 131 S. Ct. at 2428 (citing United States v. Leon, 468 U.S. 897, 909 (1984)).

 Â¶152Â Â Â Â Â Â Â Â  The Colorado General Assembly has codified a good faith exception to the exclusionary rule that is substantially similar toÂ the Leon âobjectively reasonableâ test. Pacheco, 175 P.3d at 96. Section 16-3-308(1), C.R.S. 2015, provides that â[e]vidence which is otherwise admissible in a criminal proceeding shall not be suppressed by the trial court if the court determines that the evidence was seized by a peace officer . . . as a result of a good faith mistake or of a technical violation.â A âtechnical violationâ is defined to include âreasonable good faith reliance upon . . . a warrant which is later invalidated due to a good faith mistake.â Â§ 16-3-308(2)(b). Section 16-3-308 governs good faith mistakes of law as well as those of fact. Â§ 16-3-308(2)(a); see also Heien v. North Carolina, 574 U.S. ___, ___, 135 S. Ct. 530, 536 (2014) (reasonable suspicion for a traffic stop under the Fourth Amendment can rest on a reasonable mistake of law). The key inquiry under the statute is whether the officer acted in an objectively reasonable manner in relying on the search warrant. Pacheco, 175 P.3d at 95.

 Â¶153Â Â Â Â Â Â Â Â  The record supports the trial courtâs finding and conclusion that the procedures used satisfied military law and procedure. The Military Rules of Evidence provide that upon a determination of probable cause, a military judge or magistrate may authorize a search of (1) individuals subject to military law, (2) militaryÂ property, or (3) persons and property within military control. Mil. R. Evid. 315(c), (d)(2). A determination of probable cause may be based, in pertinent part, on â[o]ral statements, communicated to the authorizing official in person, via telephone, or by other appropriate means of communication.â Mil. R. Evid. 315(f)(2)(B).

 Â¶154Â Â Â Â Â Â Â Â  Accordingly, âunder military rules oral affidavits and oral authorization of search warrants without contemporaneous writings are free from any constitutional infirmity.â United States v. Brown, 784 F.2d 1033, 1037 (10th Cir. 1986); see also Wallis v. OâKier, 491 F.2d 1323, 1325 (10th Cir. 1974). Consequently, the military police officers involved did not commit any misconduct to be deterred by exclusion.

 Â¶155Â Â Â Â Â Â Â Â  Similarly, the sheriffâs detective involved in procuring the search warrant reasonably believed that he needed to obtain authorization from military officials. To the extent that he was mistaken in his belief that a warrant issued in accordance with military law satisfied the requirements of the Colorado Constitution, such a mistake was objectively reasonable, given that no Colorado case has specifically addressed this issue, and such procedures have been found to comply with federal constitutionalÂ requirements, see, e.g., United States v. Chapman, 954 F.2d 1352, 1371 (7th Cir. 1992); Brown, 784 F.2d at 1037; United States v. Grisby, 335 F.2d 652, 656 (4th Cir. 1964); United States v. Rogers, 388 F. Supp. 298, 301 (E.D. Va. 1975).[7]

 Â¶156Â Â Â Â Â Â Â Â  Accordingly, we conclude that even if the search warrant was invalid, the law enforcement officers involved in obtaining and executing the warrant acted in an objectively reasonable manner. The trial court thus did not err in denying Markoâs motion to suppress the evidence seized during the search.

 V. Psychiatristâs Testimony
 A. Facts

 Â¶157Â Â Â Â Â Â Â Â  After Marko entered a plea of NGRI, the trial court ordered him to undergo a sanity examination at CMHIP. At trial, the psychiatrist who conducted the examination testified as an expert witness for the prosecution.

 Â¶158Â Â Â Â Â Â Â Â  Defense counsel filed a pretrial motion requesting the court to order that âany privileged statements which the prosecution obtainsÂ through any court ordered . . . examination procedure may only be used to rebut [Markoâs] evidence of insanity and for no other purpose.â Prior to the psychiatristâs testimony, defense counsel requested that the jury be given a limiting instruction to the same effect. The court instructed the jury that â[e]vidence acquired directly or indirectly for the first time from a communication derived from [Markoâs] mental processes during the course of a court-ordered examination may be considered only as to the issues raised by [Markoâs] plea of [NGRI] or to [Markoâs] mental condition.â The trial court gave the jury the same instruction in written form before deliberations.

 Â¶159Â Â Â Â Â Â Â Â  The psychiatrist testified that, during the examination, Marko told him that on the day of the incident, he was in the mountains with the victim when he heard at least three gunshots. According to the psychiatrist, Marko said that the sound of the gunshots caused him to black out, and when he came to, the victim was âlying there,â and he had a bloody knife in his hand. The psychiatrist testified that Marko told him that he had no recollection of the stabbing.Â 

 Â¶160Â Â Â Â Â Â Â Â  The psychiatrist testified that he believed that Marko was essentially faking symptoms of amnesia (which he described as âmalingeringâ), especially considering the level of detail regarding the incident Marko had provided to the police during the investigation. The psychiatrist stated that based on the inconsistencies in Markoâs stories to the police, his various contradictory statements, and other factors, âthe explanation of amnesia, dissociative flashback triggered by hearing gunshots in the distance, [was] not one [he] was prepared to believe.â

 Â¶161Â Â Â Â Â Â Â Â  The psychiatrist further testified that he was ânot buying the story that was given to [him]â by Marko; rather, he believed that Marko had âsubstantial recollection of what went down on that day.â The psychiatrist described Markoâs account of the incident as âso suspect,â âhighly suspect,â and âmade up.â

 Â¶162Â Â Â Â Â Â Â Â  The psychiatrist opined, among other things, that Marko had the ability to distinguish between right and wrong; that Markoâs conduct âreflect[ed] a knowledge of wrongfulnessâ; that Marko knew what he was doing and âcertainly [knew] what the rest of us consider right and wrong; that youâre not supposed to kill peopleâ; and that Marko âvery much [k]new the wrongfulness of his actions.â

 B. Law and Application

 Â¶163Â Â Â Â Â Â Â Â  The General Assembly has enacted a comprehensive statutory scheme governing the insanity defense. A person is deemed âinsaneâ under that scheme if:

 (a) [The] person . . . is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act . . . ; or

 (b) [The] person . . . suffered from a condition of mind caused by mental disease or defect that prevented the person from forming a culpable mental state that is an essential element of a crime charged.

 Â§ 16-8-101.5(1), C.R.S. 2015.

 Â¶164Â Â Â Â Â Â Â Â  If a criminal defendant pleads NGRI, the trial court âshall forthwith commit the defendant for a sanity examination.â

 Â§ 16-8-105.5(1), C.R.S. 2015. To preserve a defendantâs privilege against self-incrimination, evidence derived from court-ordered sanity examinations may be used only to determine whether the defendant is legally insane and cannot be considered in determining the defendantâs substantive guilt. People v. Herrera, 87 P.3d 240, 244 (Colo. App. 2003). Section 16-8-107, C.R.S. 2015, provides:

 (1)(a) . . . [N]o evidence acquired directly or indirectly for the first time from a communication derived from the defendantâsÂ mental processes during the course of a court-ordered examination . . . is admissible against the defendant on the issues raised by a plea of not guilty, if the defendant is put to trial on those issues, except to rebut evidence of his or her mental condition introduced by the defendant to show incapacity to form a culpable mental state; and in such case, that evidence may be considered by the trier of fact only as bearing upon the question of capacity to form a culpable mental state, and the jury, at the request of either party, shall be so instructed.

 . . . .

 (1.5)(a) . . . [E]vidence acquired directly or indirectly for the first time from a communication derived from the defendantâs mental processes during the course of a court-ordered examination . . . is admissible only as to the issues raised by the defendantâs plea of not guilty by reason of insanity, and the jury, at the request of either party, shall be so instructed.

 Â¶165Â Â Â Â Â Â Â Â  Thus, under section 16-8-107(1)(a) and (1.5)(a), evidence acquired for the first time from communications derived from a defendantâs mental processes during the court-ordered examination is admissible only as to the issue of insanity. People v. Bielecki, 964 P.2d 598, 603 (Colo. App. 1998). Both subsection (1)(a) and subsection (1.5)(a) are triggered when a defendant pleads NGRI. People v. Herdman, 2012 COA 89, Â¶21.

 Â¶166Â Â Â Â Â Â Â Â  Marko argues that the psychiatristâs testimony violated section 16-8-107(1)(a) and (1.5)(a) because the psychiatrist who performed his court-ordered sanity examination testified that Marko knew his actions were wrong rather than confining his testimony to whether Marko had the capacity to distinguish right from wrong or form the culpable mental state at the time of the offense. We agree, but we conclude that reversal is not required.

 Â¶167Â Â Â Â Â Â Â Â  The parties disagree over whether Marko preserved this issue for review. Marko cites Herrera, 87 P.3d at 251, for the proposition that his motion in limine and his request for a limiting instruction during trial were sufficient to preserve the issue for review and thus we should review for constitutional harmless error. The People disagree, arguing that Marko needed to object to the specific testimony that he now contends was improper to preserve the issue. We need not resolve this dispute, because we conclude that even under a constitutional harmless error standard, the statements do not require reversal.

 Â¶168Â Â Â Â Â Â Â Â  We agree with Marko that the psychiatristâs statements that he knew the wrongfulness of his actions (at least to the extent that the statements were based on communications made by Marko to theÂ psychiatrist during the exam) violated section 16-8-107 and his right against self-incrimination.

 Â¶169Â Â Â Â Â Â Â Â  âIn Colorado, there are two forms of insanity, which are defenses to all crimes. The first requires [the] evidence to establish that [the defendant was] incapable of distinguishing right from wrong with respect to the offense,â and the second requires the evidence to show that the defendant was incapable of âforming a culpable mental state that is an essential element of the crime.â People v. Sommers, 200 P.3d 1089, 1093 (Colo. App. 2008) (citing Â§ 16-8-101.5(1)(a)).

 Â¶170Â Â Â Â Â Â Â Â  Herrera, 87 P.3d at 251, addressed a defendantâs claim that he was insane under the second definition of insanity, concluding that section â16-8-107(1)(a) and (1.5)(a) limit the admissibility of evidence acquired for the first time from [the] defendantâs mental processes during the court-ordered examination to issues involving his capacity to form a culpable mental state.â Under the same rationale, when a defendant claims that he or she is insane under the first definition of insanity, evidence acquired for the first time during a sanity examination must be limited to issues involving the capacity to distinguish right from wrong. See id.

 Â¶171Â Â Â Â Â Â Â Â  The division in Herrera explained that â[t]estimony that a defendant acted with specific intent and after deliberation necessarily presupposes an opinion that he or she had the capacity to form such a culpable mental state.â Id. Similarly, testimony that a defendant knew the wrongfulness of his or her actions presupposes that he or she was capable of distinguishing right from wrong. But because the type of evidence governed by section 16-8Â­107 must be limited to capability to form the culpable mental state or to distinguish right from wrong to protect a defendantâs privilege against self-incrimination, opinions that a defendant actually formed the culpable mental state or actually knew the wrongfulness of his or her actions ânecessarily relate to guilt of the substantive offense.â See id.

 Â¶172Â Â Â Â Â Â Â Â  Thus, the psychiatristâs statements that Marko knew the wrongfulness of his actions, which constituted âevidence acquired directly or indirectly for the first time from a communication derived from the defendantâs mental processes during the court-ordered examination,â Â§ 16-8-107, concerned Markoâs substantive guilt and the trial court therefore erred in admitting them. See Herrera, 87 P.3d at 251.Â 

 Â¶173Â Â Â Â Â Â Â Â  Because we are assuming, without deciding, that Marko preserved this error, we review for constitutional harmless error because the privilege against self-incrimination is infringed if the information obtained from a court-ordered sanity examination is admitted in violation of section 16-8-107. Cf. id. at 245 (â[T]he privilege against self-incrimination is not implicated by a court-ordered mental examination when the information obtained therefrom is admitted only on the issue of mental condition.â). âUnder a constitutional harmless error standard, reversal is required unless the [reviewing] court is confident beyond a reasonable doubt that the defendant was not prejudiced by the error.â Id. at 251.

 Â¶174Â Â Â Â Â Â Â Â  In Herrera, the psychiatrist who had conducted the defendantâs sanity examination testified that he thought the defendant âdid deliberateâ the murder of his father; that the defendant was âbasically trying to inflict lethal woundsâ; that the defendant knew âwhat he was doing and he did what he was trying to doâ; that the defendant âhad lethal intentâ; that he thought that the defendant âintended to kill his dadâ; that he thought that the defendant âhad a goal, and that goal was to harm or inflict a fatalÂ injury on his father,â and again, that the defendantâs âintention was to harm his father.â Id. During closing argument, the prosecutor emphasized the psychiatristâs opinion that the defendant had the intent to kill and acted after deliberation to argue that the defendant was guilty of the substantive offense. Id. at 252.

 Â¶175Â Â Â Â Â Â Â Â  The Herrera division held that reversal was required because it could not say with fair assurance that the psychiatristâs improper testimony and the prosecutorâs references to that testimony were harmless beyond a reasonable doubt. Id. at 251, 253.

 Â¶176Â Â Â Â Â Â Â Â  In contrast to the numerous references to the defendantâs culpable mental state by the psychiatrist in Herrera, the impermissible statements in this case were few and relatively inconspicuous in the context of the psychiatristâs lengthy testimony. Although the statements concerned Markoâs guilt, they did not contain the psychiatristâs direct opinion that Marko had the culpable mental state required for the offense, and they did not directly address any of the substantive elements of the offenses charged.

 Â¶177During closing argument, the prosecutor limited her discussion of the psychiatristâs testimony to issues raised by theÂ NGRI plea. Further, the court specifically instructed the jury that the psychiatristâs statements could be considered only as to the issues raised by Markoâs NGRI plea. Unlike in Herrera, id. at 252, in which the prosecutor argued to the jury that the same instruction meant that it âmust use [the psychiatristâs] testimony in evaluating the defendantâs culpable mental state âafter deliberationâ and âwith intent,ââ no such misinterpretation was put forward here.

 Â¶178Â Â Â Â Â Â Â Â  Moreover, the other evidence from which it could be inferred that Marko knew the wrongfulness of his actions was substantial; for example, the prosecution introduced evidence that Marko took actions to conceal the crime; that he told the police that he initially lied to them about knowing the victim because, in his own words, he wanted to cover his tracks; and that he said that the victimâs father would say that what he had done to the victim was â[r]ape [or] murder.â

 Â¶179Â Â Â Â Â Â Â Â  Based on these circumstances, we are convinced that the error in admitting the psychiatristâs statements was harmless beyond a reasonable doubt.

 Â¶180Â Â Â Â Â Â Â Â  Marko also argues that the psychiatrist improperly opined on his guilt and credibility by testifying that he did not believe MarkoâsÂ account describing his mental state at the time of the offense. We reject this argument.

 Â¶181Â Â Â Â Â Â Â Â  Because defense counsel did not object to the psychiatristâs testimony on this ground, we review for plain error. See People v. Rector, 248 P.3d 1196, 1202 (Colo. 2011). âPlain error is an obvious and substantial error that so undermined the fundamental fairness of the trial itself . . . as to cast serious doubt on the reliability of the judgment of conviction.â People v. Douglas, 2012 COA 57, Â¶51 (internal quotation marks omitted).

 Â¶182Â Â Â Â Â Â Â Â  The psychiatrist did not express personal disbelief regarding Markoâs account of his mental state at the time of the offense. Rather, the psychiatrist rejected a possible medical diagnosis â that Marko had amnesia â and offered another diagnosis â that Marko was malingering. The psychiatristâs statements therefore directly addressed issues raised by Markoâs NGRI plea, including whether Marko was in a dissociative state at the time of the offense, and did not constitute an improper opinion of guilt.

 Â¶183Â Â Â Â Â Â Â Â  Marko argues that the psychiatristâs statements violated the rule that a witness may not opine as to whether another witness was telling the truth on a specific occasion. See, e.g., People v.Â Ayala, 919 P.2d 830, 834 (Colo. App. 1995). However, â[t]here is a difference, subtle though it may be, between the psychiatric evaluations of the statements made to [an expert witness] and stating an opinion about the credibility of the witness[].â State v. Cone, 3 S.W.3d 833, 844 (Mo. Ct. App. 1999). The former âis necessary to establish a firm factual basis for the proffered opinion and, therefore, a critical part of the expertsâ evaluation,â whereas the âlatter violates a firmly entrenched rule of evidence prohibiting comment on the [witnessâ] credibility.â Id.

 Â¶184Â Â Â Â Â Â Â Â  The psychiatristâs statements were not general comments on Markoâs credibility but rather specifically explained why the psychiatrist reached the sanity conclusion he did. An âexpert witness may testify to any conclusions [as to the defendantâs mental state that] he is able to draw from the conduct or actions of the defendant during [a sanity examination]â because such conclusions are ârelevant to the inquiry prompted by the defendantâs plea.â Johnson v. People, 172 Colo. 72, 77, 470 P.3d 37, 40 (1970). The psychiatristâs evaluation of the truth of Markoâs statements was a critical component of his assessment of Markoâs mental state. The psychiatristâs statements that he did not believe Marko when heÂ said that he did not remember killing the victim explained why the psychiatrist opined that Marko did not have amnesia even though Marko had told him that he had blacked out. The psychiatristâs statements thus established a basis for his opinion of Markoâs mental state and did not constitute an impermissible opinion whether Marko told the truth on a specific occasion.

 Â¶185Â Â Â Â Â Â Â Â  Accordingly, the admission of the statements by the psychiatrist does not require reversal of Markoâs convictions.

 VI. Constitutional Challenges to NGRI Statutes

 Â¶186Â Â Â Â Â Â Â Â  Marko argues that the trial court erred in denying his motions to declare unconstitutional the current statutory procedure scheme governing NGRI pleas and to bifurcate the trial. We reject this argument.

 Â¶187Â Â Â Â Â Â Â Â  The trial court concluded, primarily relying on Herrera, that Marko failed to establish that the statutory scheme was unconstitutional. It similarly denied the motion for bifurcation, concluding that Marko had not established that application of the unitary procedure violated his due process rights or privilege against self-incrimination.

 Â¶188Â Â Â Â Â Â Â Â  We review the constitutionality of statutes de novo. Hinojos-Mendoza v. People, 169 P.3d 662, 668 (Colo. 2007). Statutes are presumed to be constitutional, and thus the party challenging the constitutionality of a statute has a heavy burden to establish that it is unconstitutional. Id.

 Â¶189Â Â Â Â Â Â Â Â  Marko makes several arguments as to why the statutory scheme governing NGRI pleas is unconstitutional. First, he argues that the current unitary procedure violates a defendantâs due process rights and the privilege against self-incrimination because it exposes the jury to the defendantâs statements made during a court-ordered sanity examination.

 Â¶190Â Â Â Â Â Â Â Â  Prior to July 1, 1995, criminal defendants who pleaded NGRI in Colorado received a bifurcated trial, with the issues raised by the NGRI plea tried separately and to a different jury than the jury that determined the issues raised by a not guilty plea. Â§Â§ 16-8-104, 16-8-105, C.R.S. 2015 (applying to offenses committed before July 1, 1995).

 Â¶191Â Â Â Â Â Â Â Â  In 1996, the General Assembly instituted a unitary trial procedure to replace the former system of bifurcated trials. People v. Laeke, 2012 CO 13, Â¶12; see also Â§ 16-8-101.3, C.R.S. 2015.Â For offenses committed on or after July 1, 1995, â[t]he issues raised by the plea of [NGRI] shall be treated as an affirmative defense and shall be tried at the same proceeding and before the same trier of fact as the charges to which [NGRI] is offered as a defense.â Â§ 16-8-104.5, C.R.S. 2015.

 Â¶192Â Â Â Â Â Â Â Â  âThe procedures governing the insanity defense cannot be applied in a manner that destroys the constitutional safeguard against self-incrimination.â People v. Rosenthal, 617 P.2d 551, 555 (Colo. 1980). If the prosecution is permitted to make unrestricted use of a defendantâs communications during a sanity examination, the defendant in effect becomes a witness against himself or herself through the conduit of the psychiatrist, in violation of the privilege against self-incrimination. Id. In a bifurcated trial, there is no risk of self-incrimination because a defendantâs statements to a psychiatrist during a sanity examination are not introduced during the guilt phase of the trial and, by definition, self-incrimination contemplates the use of the statements to aid in establishing the defendantâs guilt. See Lewis v. Thulemeyer, 189 Colo. 139, 141, 538 P.2d 441, 442 (1975).

 Â¶193Â Â Â Â Â Â Â Â  The unitary trial procedure does not contain the same inherent safeguard. Herrera, 87 P.3d at 245, addressed whether the unitary system therefore violates a defendantâs privilege against self-incrimination. In concluding that the current statutory scheme does not infringe upon the privilege against self-incrimination, the Herrera division emphasized that section 16-8-107 âprovide[s] essentially the same protection [as a bifurcated trial]: evidence first acquired from a defendant during court-ordered examinationsâ may only be used at trial to establish the defendantâs sanity or insanity. Id.

 Â¶194Â Â Â Â Â Â Â Â  The Herrera division further concluded that limiting instructions based on section 16-8-107(1)(a) and (1.5)(a) âcan . . . be sufficient to protect a defendantâs privilege against self-incrimination in the face of a court-ordered sanity examination.â Id. at 246. Marko argues that Herrera failed to consider the principle that, in some circumstances, the risk that the jury will not, or cannot, follow instructions is so great, and the consequences are so great, that the practical and human limitations of the jury system cannot be ignored. Marko asserts that such circumstances includeÂ when the jury is exposed to incriminating statements made during a court-ordered sanity examination.

 Â¶195Â Â Â Â Â Â Â Â  However, absent evidence to the contrary, we presume jurors understand and heed jury instructions. People v. Carter, 2015 COA 24M, Â¶59.[8] Without any additional information establishing that this context is different from many other situations in which limiting instructions serve to allow the introduction in criminal trials of evidence that would otherwise be impermissible, we conclude that instructions based on section 16-8-107 are sufficient to protect a defendantâs privilege against self-incrimination. We therefore follow Herrera in concluding that the unitary trial procedure does not violate a defendantâs right against self-incrimination. See also Grenier, 200 P.3d at 1077-78 (following Herrera).

 Â¶196Â Â Â Â Â Â Â Â  Marko also argues that the unitary system violates a defendantâs right to due process by forcing the defendant to choose between self-incrimination and losing the right to present a meaningful insanity defense. Similarly, Marko argues that because the statutory scheme compels a defendant to make involuntary statements through the threat of losing his or her insanity defense, it violates the defendantâs due process rights against the admission of involuntary statements. We disagree.

 Â¶197Â Â Â Â Â Â Â Â  Section 16-8-106(2)(c), C.R.S. 2015, provides that if a defendant fails to cooperate with the psychiatrist conducting the insanity defense, he or she will not be allowed to present expert testimony on his or her mental condition and insanity. The statute also permits admission at trial of the fact of the defendantâs noncooperation âto rebut any evidence introduced by the defendant with regard to the defendantâs mental condition including, but not limited to, the issue of insanity.â Id.

 Â¶198Â Â Â Â Â Â Â Â  Herrera, 87 P.3d at 247-48, concluded that section 16-8Â­106(2)(c) does not impermissibly require a defendant to choose between incriminating himself or herself or forfeiting an insanityÂ defense, nor does it compel the defendant to make involuntary statements in violation of his or her due process rights.

 Â¶199Â Â Â Â Â Â Â Â  The Herrera division concluded that the cooperation statute serves a legitimate purpose because, otherwise, a defendant would be permitted âto raise and support an insanity defense while unfairly depriving the prosecution of any method of testing the validity of that defense.â Id. at 247. Marko argues that the same purpose is accomplished, without preventing a defendant from introducing expert testimony, by allowing the prosecution to introduce evidence of noncooperation. We disagree. Rather, if a defendant presents evidence through an expert who has examined him or her, it would be unfair, and would undermine the truth-seeking function of a criminal trial, not to allow the prosecution the same opportunity. See Kansas v. Cheever, 571 U.S. ___, ___, 134 S. Ct. 596, 601 (2013); see also Rosenthal, 617 P.2d at 556 (disapproving of rules which would deter the cooperation and candidness necessary for effective psychodiagnosis and thus erode the reliability of psychiatric opinion evidence in the factfinding process).

 Â¶200Â Â Â Â Â Â Â Â  We also agree with Herrera, 87 P.3d at 247, that section 16-8Â­106(2)(c) does not completely bar a defendant from raising insanity as a defense; it merely forces him or her to cooperate with the psychiatrist conducting the sanity examination or be precluded from presenting expert testimony in support of the defense. The Constitution does not forbid âevery government imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights.â Chaffin v. Stynchombe, 412 U.S. 17, 30 (1973).

 Â¶201Â Â Â Â Â Â Â Â  The fact that a defendant is faced with a difficult decision does not in itself force him or her to choose between the exercise of two constitutional rights. See Herrera, 87 P.3d at 248. Rather, as discussed above, because a defendantâs statements during a sanity examination may not be introduced at trial to establish guilt, requiring a defendant to cooperate does not subject him or her to an unconstitutional risk of self-incrimination. Id. at 247. And requiring a defendant to choose noncooperation or the presentation of expert testimony in support of an insanity defense does not unconstitutionally deprive the defendant of the right to present a defense, nor does it unconstitutionally threaten him or her withÂ such a deprivation. Id. at 248; see also People v. Bondurant, 2012 COA 50, Â¶Â¶41-47 (following Herrera).

 Â¶202Â Â Â Â Â Â Â Â  Accordingly, we reject Markoâs arguments that the statutory scheme governing NGRI pleas is unconstitutional.

 VII. Prosecutorial Misconduct

 Â¶203Â Â Â Â Â Â Â Â  Marko argues that the prosecutor made several statements during voir dire and closing argument that constituted prosecutorial misconduct. We agree that some of the statements were improper, but we conclude that they do not require reversal.

 A. Law

 Â¶204Â Â Â Â Â Â Â Â  In reviewing a claim of prosecutorial misconduct, we engage in a two-step analysis, determining, first, whether the prosecutorâs conduct was improper based on the totality of the circumstances and, second, whether such actions warrant reversal. Wend v. People, 235 P.3d 1089, 1096 (Colo. 2010). We evaluate claims of improper argument âin the context of the argument as a whole and in light of the evidence before the jury.â People v. Samson, 2012 COA 167, Â¶30.

 Â¶205Â Â Â Â Â Â Â Â  Defense counsel did not object to any of the prosecutorâs statements Marko now contends were impermissible. We thusÂ review the allegedly improper statements for plain error, which requires reversal âonly when there is a substantial likelihood that [they] affected the verdict or that [they] deprived the defendant of a fair and impartial trial.â People v. Strock, 252 P.3d 1148, 1153 (Colo. App. 2010). âTo constitute plain error, prosecutorial misconduct must be flagrant or glaringly or tremendously improper.â Id. at 1152 (internal quotation marks omitted).

 Â¶206Â Â Â Â Â Â Â Â  âA prosecutor has wide latitude to make arguments based on facts in evidence and reasonable inferences drawn from those facts.â Id. at 1153. âCounsel may also touch upon the instructions of law submitted to the jury.â Domingo-Gomez v. People, 125 P.3d 1043, 1048 (Colo. 2005). The prosecutor âmay employ rhetorical devices and engage in oratorical embellishments and metaphorical nuance, so long as he or she does not thereby induce the jury to determine guilt on the basis of passion or prejudice, attempt to inject irrelevant issues into the case, or accomplish some other improper purpose.â People v. Allee, 77 P.3d 831, 837 (Colo. App. 2003).

 Â¶207Â Â Â Â Â Â Â Â  However, a prosecutor may not misstate the evidence, Samson, Â¶32, nor may a prosecutor refer to facts not in evidence,Â People v. McMinn, 2013 COA 94, Â¶62. It is also improper for a prosecutor to misstate or misinterpret the law. People v. Anderson, 991 P.2d 319, 321 (Colo. App. 1999).

 B. Beyond a Reasonable Doubt

 Â¶208Â Â Â Â Â Â Â Â  During voir dire, the prosecutor engaged in the following colloquy with a prospective juror:

 [Prosecutor]: [Juror H], Iâve mentioned and the judge has talked about beyond a reasonable doubt, our burden of proof. Iâm going to use an example with you. Did you drive to the courthouse today?

 [Juror H]: Yes.

 [Prosecutor]: How many times have you gotten in your car and driven? Do you do that on a daily basis?

 [Juror H]: Sometimes.

 [Prospector]: And so based on reason and common sense you feel comfortable driving, feeling comfortable that the person on the other side of the road will stay in their lane.

 [Juror H]: Most of the time, yes.

 [Prosecutor]: Thatâs what weâre talking about beyond a reasonable doubt. Weâre talking about youâre relying on your common sense and the everyday decisions you make every day. Beyond a reasonable doubt is not beyond a shadow of a doubt. Itâs not one hundredÂ percent. . . . You donât know if the other person is going to stay in the lane a hundred percent; but, based on your experience, you can make a decision to drive your car.

 Â¶209Â Â Â Â Â Â Â Â  Marko argues that these statements distorted the prosecutionâs burden of proving the elements of the charged offenses beyond a reasonable doubt because jury deliberations in a murder trial are the antithesis of mundane, everyday decisions like driving a car.

 Â¶210Â Â Â Â Â Â Â Â  In People v. Cevillo-Acosta, 140 P.3d 116, 123 (Colo. App. 2005), a division of this court held that the prosecutorâs discussion on reasonable doubt during voir dire, which included buying a house as an example, did not constitute plain error when it occupied a small part of the transcript, the prosecutor did not make similar arguments during closing, and the jury was properly instructed as to the definition of reasonable doubt.

 Â¶211Â Â Â Â Â Â Â Â  Likewise, in this case, the prosecutorâs statements were a very small part of a lengthy voir dire and trial, and the jury was properly instructed on the definition of reasonable doubt. Thus, even if the prosecutorâs statements were improper, they did not constitute plain error.

 C. After Deliberation

 Â¶212Â Â Â Â Â Â Â Â  During voir dire, the prosecutor engaged in the following colloquy with several prospective jurors:

 [Prosecutor]: Iâm going to talk to you about first degree murder after deliberation. Thatâs murder where itâs not only an intentional act but itâs also after deliberation, after reflection and judgment on the part of the person who committed the crime. Do you watch football?

 [Juror]:Yes

 . . . .

 [Prosecutor]: The quarterback â the ball is snapped. The quarterback is in the pocket and has to make a decision whether thereâs an open receiver. He sees the open receiver is blocked or thereâs a lot of coverage on him, and he decides to just pass it off to another person and not even throw the football. Do you think thatâs an example of reflection and judgment?

 [Juror G]: Yes. Go elsewhere with it.

 [Prosecutor]: Itâs quick. Thatâs what weâre talking about reflection and judgment under the law. Itâs a quick decision. Itâs not hasty or impulsive but itâs enough for a person to pause, reflect and make a decision. Does that make sense to you for murder after deliberation?

 [Juror G]: (Nodded head.) . . .

 [Prosecutor]: The jury can take into consideration all the words and actions that the [d]efendant has. Iâm going to use an example with you. Iâm going to pick up this pen. Thereâs my physical action that I picked it up.

 . . .

 [Prosecutor]: Was there reflection [and] judgment when I went over and picked up the pen?

 [Juror B]: It could have been before, but it could also have been while youâre doing it, youâre also deciding it. . . .

 [Prosecutor]: And you may not have known, but I didnât want to pick up a Hi-Liter. Because if I was using the word âpen,â Hi-Liter wouldnât fit. It was upon reflection and judgment and I intentionally picked up the pen.

 Would it also matter what a person did after a crime happened?

 [Juror B]: Yes, definitely. . . . If you tried to hide the fact that you did the crime by lying to someone about the circumstance, that shows youâre trying to slough off. Youâre trying to get the authorities to look elsewhere. So, indeed, what you do after the fact is as bad as what you did during the act.

 Â¶213Â Â Â Â Â Â Â Â  In closing argument, the prosecutor made the following statements:

 [A]fter deliberation. Reflection, judgment. Thatâs what we talked about in jury selection. Thatâs what weâve shown you; that he made a decision to do what he did.

 . . .

 So these are just pictures that you will have on hand of the bandages [the cloths used as a blindfold and a gag]. You all saw this location. The picture on the right is how far the bandages were buried from the roadway.

 So reflection [and] judgment. [Marko] can demonstrate for [the detective] [how he cut the victimâs throat]. . . . His shirt and pants are covered with [the victimâs] blood and the bandages are soaked in [the victimâs] blood.

 The status of the knife. He said he washed the knife because he was just trying to forget what happened up there. How can you try forget [sic] what you canât remember in the first place?

 So these are just pictures of the knife and the pants where they were found. So further reflection [and] judgment.

 Â¶214Â Â Â Â Â Â Â Â  Marko argues that the comparison of âafter deliberationâ with the decisions of throwing a football or picking up a pen misstated the law and lessened the prosecutionâs burden of proving this element because these decisions are the opposite of the deliberative, decision-making processes that would constitute âafter deliberationâ under the statutory definition.

 Â¶215Â Â Â Â Â Â Â Â  ââ[A]fter deliberationâ means not only intentionally but also that the decision to commit the act has been made after the exercise ofÂ reflection and judgment concerning the act. An act committed after deliberation is never one which has been committed in a hasty or impulsive manner.â Â§ 18-3-101(3), C.R.S. 2015; see also People v. Dist. Court, 926 P.2d 567, 570 (Colo. 1996). We conclude that the prosecutorâs analogies were improper but that they do not constitute reversible error.

 Â¶216Â Â Â Â Â Â Â Â  In People v. McBride, 228 P.3d 216, 225 (Colo. App. 2009), the prosecutorâs use of driving through a yellow light as an analogy to explain âafter deliberationâ was deemed âinaptâ because â[d]riving through a yellow light . . . typically is an inconsequential decision made hastily or impulsively.â But the division explained that what made the argument plainly wrong was the prosecutorâs insistence that yellow-light deliberation could occur as âfastâ as â[a] second.â Id. Colorado law requires the lapse of an appreciable length of time to allow reflection and judgment, and if deliberation could occur as fast as a second, there would be nothing to the appreciable length of time requirement. Id.; see also Martinez v. People, 2015 CO 16, Â¶18 (âafter deliberationâ requires an appreciable length of time between forming the intent to kill and committing the fatal act).

 Â¶217Â Â Â Â Â Â Â Â  Here, in contrast, the prosecutor did not say that picking up a pen or throwing a football are decisions made in any specific length of time. Thus, although such decisions are arguably made without the lapse of an appreciable length of time to allow for deliberation, the prosecutor did not emphasize this aspect of those decisions. Accordingly, the statements were not âflagrant or glaringly or tremendously improper.â See Strock, 252 P.3d at 1152.

 Â¶218Â Â Â Â Â Â Â Â  Marko also argues that the prosecutor misstated the law and lessened the prosecutionâs burden of proving this element by telling the jury that evidence of Markoâs conduct after the victimâs death could be used to establish deliberation. Examining the prosecutorâs statements in the context of the argument as a whole, we find it difficult to discern whether the prosecutor actually did make such an argument. Given the ambiguity of the prosecutorâs statements and their relative brevity, they did not constitute plain error.

 D. Wishes of the Community and Justice for the Victim

 Â¶219Â Â Â Â Â Â Â Â  The prosecutor opened her closing argument by saying:

 Members of the jury, this is a case where [Marko] had control over the crime scene. He had control over the victim, and this is the point in time when the community takes control of his actions. And you, asÂ representatives of the community, will make a decision in this case.

 Â¶220Â Â Â Â Â Â Â Â  The prosecutor later made the following statements:

 So letâs talk about [the victim] . . . . Remember [the victimâs motherâs] testimony and how heart felt [sic], how much they miss [the victim]. [The victim] was trying to get along in the world. She was participating in an independent living program. She didnât graduate from high school. She would believe anything anyone told her. She was a very quiet and good girl. . . . This is [the victim]. So [the victim] is a member of our community. She was a member of our community, and she deserves the protections of the law just like anyone else.

 Â¶221Â Â Â Â Â Â Â Â  A prosecutor should not encourage âthe jury to depart from its duty to decide the case on the evidence [by] asking the jury to memorialize or pay tribute to the victims by its verdict,â People v. Dunlap, 975 P.2d 723, 759 (Colo. 1999), or âpressure jurors by suggesting that guilty verdicts are necessary to do justice for a sympathetic victim,â McBride, 228 P.3d at 223. Nor should a prosecutor âappeal to the jury to consider the wishes of the community in reaching a verdict,â People v. Rodriguez, 794 P.2d 965, 977 (Colo. 1990), or ask the jury to âsend a message to the community,â People v. Gallegos, 260 P.3d 15, 28 (Colo. App 2010).Â Appeals to the âemotionalism . . . of the jurorsâ are similarly improper. People v. Eckert, 919 P.2d 962, 967 (Colo. App. 1996).

 Â¶222Â Â Â Â Â Â Â Â  Applying these principles, we conclude that the prosecutorâs statements were improper because they asked the jurors to consider the wishes of the community, appealed to the jurorsâ sympathy for the victim, and suggested that a guilty verdict was necessary to do justice for the community and the victim.

 Â¶223Â Â Â Â Â Â Â Â  However, considering that these statements were a small part of the prosecutorâs closing argument, we conclude that none, viewed individually or cumulatively, so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. See Strock, 252 P.3d at 1152.

 E. Burden Shifting

 Â¶224Â Â Â Â Â Â Â Â  Marko argues that the prosecutor impermissibly shifted the burden of proof to the defense on the sexual assault charges by saying during closing that âthereâs no evidence of consent to sexual contact. The [online messages] go back to May, 2008. Thereâs no proof that the penetration was an act of cooperation and free will. There may have been text messages back and forth, phone calls; but thatâs no excuse for the crime.âÂ 

 Â¶225Â Â Â Â Â Â Â Â  An improper lessening of the prosecutionâs burden of proof violates a defendantâs constitutional right to due process. People v. Whaley, 159 P.3d 757, 760 (Colo. App. 2006). Accordingly, â[t]he prosecution cannot attempt to shift the burden of proof to the defense.â People v. Bowring, 902 P.2d 911, 921 (Colo. App. 1995).

 Â¶226Â Â Â Â Â Â Â Â  Factors to consider in determining the strength of a prosecutorâs burden-shifting actions and whether they have shifted the burden of proof include whether âthe prosecutor specifically argued or intended to establish that the defendant carried the burden of proofâ and whether âthe prosecutorâs actions constituted a fair response to the questioning and comments of defense counsel.â People v. Santana, 255 P.3d 1126, 1131 (Colo. 2011). âA prosecutorâs comment on the lack of evidence confirming a defendantâs theory of the case is permissible and does not shift the burden of proof.â People v. Liggett, 114 P.3d 85, 89 (Colo. App. 2005), affâd, 135 P.3d 725 (Colo. 2006).

 Â¶227Â Â Â Â Â Â Â Â  Markoâs theory of defense for his not guilty plea to the sexual assault charges was consent, and defense counsel argued in closing that there was no evidence of lack of consent. Moreover, the jury was correctly instructed regarding the prosecutorâs burden of proof,Â and the prosecutor did not specifically argue that Marko had the burden to prove consent. We thus conclude that, even if we assume the prosecutorâs statements could have been interpreted as an attempt to shift the burden, they did not so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the conviction. See Strock, 252 P.3d at 1152.

 Â¶228Â Â Â Â Â Â Â Â  Marko also argues that the prosecutorâs statements were a misstatement of the evidence because there was ample evidence permitting a reasonable inference that the sexual contact was consensual. Marko emphasizes that he told the police that the sex was consensual, and that there was evidence that he and the victim had previously engaged in consensual sexual contact on multiple occasions. However, other than Markoâs statement to the police, there was no evidence that the sexual contact on this occasion was consensual. Thus, construing the prosecutorâs statement in context, the statement indicated that there was no credible evidence of consent. This was a permissible inference from the facts in evidence and therefore was not improper. See id. at 1153.

 F. Cumulative Effect

 Â¶229Â Â Â Â Â Â Â Â  Marko argues that even if no single instance of misconduct, standing alone, mandates reversal, the cumulative effect of the prosecutorial misconduct constituted plain error necessitating reversal. We disagree and conclude that the cumulative effect of the instances of misconduct we have identified did not deprive Marko of his right to a fair trial. Cf. People v. Jones, 832 P.2d 1036, 1040 (Colo. App. 1991) (âThe prosecutorâs ill-advised and improper comments were so numerous [and] highly prejudicial . . . that, as a result, defendant was deprived of a fair trial.â).

 VIII. Sufficiency of the Evidence

 Â¶230Â Â Â Â Â Â Â Â  Marko argues that the trial court erred in concluding that sufficient evidence supported the sexual assault convictions. We disagree.

 Â¶231Â Â Â Â Â Â Â Â  After the prosecution presented its case-in-chief, defense counsel moved for a judgment of acquittal on the sexual assault counts. The trial court denied the motion.

 Â¶232Â Â Â Â Â Â Â Â  We review the record de novo to determine whether the evidence was sufficient to sustain a conviction. Dempsey v. People, 117 P.3d 800, 807 (Colo. 2005).

 Â¶233Â Â Â Â Â Â Â Â  âThe due process clauses of the United States and Colorado Constitutions prohibit the criminal conviction of any person except on proof of guilt beyond a reasonable doubt.â Kogan v. People, 756 P.2d 945, 950 (Colo. 1988), abrogated on other grounds by Erickson v. People, 951 P.2d 919 (Colo. 1998). A reviewing court faced with a sufficiency challenge must determine whether the evidence, when viewed as a whole and in a light most favorable to the prosecution, is both substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty of the charge beyond a reasonable doubt. Dempsey, 117 P.3d at 807; People v. Noland, 739 P.2d 906, 907 (Colo. App. 1987). âIn making this determination, the court must give the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence, and the resolution of inconsistent testimony and determination of the credibility of the witnesses are solely within the province of the jury.â People v. Duncan, 109 P.3d 1044, 1045-46 (Colo. App. 2004).

 Â¶234Â Â Â Â Â Â Â Â  Marko was convicted of violating section 18-3-402(1)(a), C.R.S. 2015, which provides that â[a]ny actor who knowingly inflicts sexual intrusion or sexual penetration on a victim commits sexual assaultÂ if . . . [t]he actor causes submission of the victim by means of sufficient consequence reasonably calculated to cause submission against the victimâs will.â Marko argues that the evidence does not sufficiently support the juryâs verdict under this statute because the coronerâs examination of the victimâs body did not reveal any indication of sexual assault (such as injury to the victimâs vagina or anus) and he did not tell the police that he had had sex with the victim when she was unconscious.

 Â¶235Â Â Â Â Â Â Â Â  However, the evidence did not need to show that Marko had sex with the victim while she was unconscious to establish means of sufficient consequence to cause submission. Rather, viewed as a whole and in a light most favorable to the prosecution, see Dempsey, 117 P.3d at 807, evidence, which Marko himself provided, that he had knocked the victim unconscious at some point before they had sex establishes that he employed means of sufficient consequence reasonably calculated to cause submission against the victimâs will.

 Â¶236Â Â Â Â Â Â Â Â  Accordingly, we conclude that the evidence was sufficient to support Markoâs sexual assault convictions.

 IX. Merger

 Â¶237Â Â Â Â Â Â Â Â  Marko argues, the People concede, and we agree that defendantâs attempted sexual assault convictions must be vacated under the doctrine of merger.[9]

 Â¶238Â Â Â Â Â Â Â Â  âThe Double Jeopardy Clauses of the federal and state constitutions and the judicially created rule of merger bar multiple punishments for greater and lesser included offenses.â People v. Harlan, 8 P.3d 448, 478 (Colo. 2000), overruled on other grounds by People v. Miller, 113 P.3d 743 (Colo. 2005). To determine if one offense is a lesser included offense of another, we apply a âstrict elementsâ test. Id. Under that test, the lesser offense is included if proof of facts establishing the statutory elements of the greater offense necessarily establishes all the elements of the lesser offense. People v. Esparza-Treto, 282 P.3d 471, 478 (Colo. App. 2011).

 Â¶239Â Â Â Â Â Â Â Â  The strict elements test requires consideration of the statutes at issue and permits consideration of the charging documents and the judgment of conviction. Harlan, 8 P.3d at 478. But, âwe do not consider the evidence presented at trial to determine whether the offenses are greater and lesser included.â Id. at 479.

 Â¶240Â Â Â Â Â Â Â Â  Marko was charged with two counts of sexual assault, in violation of section 18-3-402(1)(a), and two counts of attempted sexual assault, in violation of section 18-3-402(1)(a) and section 18Â­2-101(1), C.R.S. 2015 (the criminal attempt statute). The only difference between the elements of sexual assault and attempted sexual assault is that sexual assault requires proof that the defendant did, rather than attempted to, inflict sexual intrusion or sexual penetration on the victim and actually caused, rather than attempted to cause, submission of the victim against his or her will. The elements of attempted sexual assault thus are established by proof of the same facts that establish sexual assault.

 Â¶241Â Â Â Â Â Â Â Â  Additionally, neither the charging document nor the jury verdict forms contain any details about the offenses so as to sufficiently distinguish the offenses of sexual assault from the offenses of attempted sexual assault. The attempted sexual assaultÂ charges are therefore lesser included offenses of the sexual assault charges.

 Â¶242Â Â Â Â Â Â Â Â  Accordingly, Markoâs attempted sexual assault convictions must merge with the sexual assault convictions, and we vacate his convictions and sentences for attempted sexual assault (vaginal) and attempted sexual assault (anal).

 X. Multiplicity

 Â¶243Â Â Â Â Â Â Â Â  Marko argues that his sexual assault convictions are multiplicitous because he told police that he had had sex with the victim only one time on October 10, and they had anal and vaginal sex during that time. We agree that the sexual assault convictions are multiplicitous.

 Â¶244Â Â Â Â Â Â Â Â  âMultiplicity is the charging of the same offense in several counts, culminating in multiple punishments.â People v. Garcia, 2012 COA 79, Â¶57. Multiplicitous convictions violate the prohibition against double jeopardy because they entail the imposition of multiple sentences for the same offense. Id.; see also Patton v. People, 35 P.3d 124, 128-29 (Colo. 2001). The simultaneous prosecution of a defendant for allegedly distinct offenses under the same statute thus may implicate a defendantâsÂ double jeopardy rights. See Quintano v. People, 105 P.3d 585, 589Â­90 (Colo. 2005).

 Â¶245Â Â Â Â Â Â Â Â  To determine whether multiple convictions under the same statute violate a defendantâs double jeopardy rights, we analyze whether the defendantâs conduct constituted factually distinct offenses. Garcia, Â¶58. In determining whether the evidence introduced at trial was sufficient to support distinct and separate sexual assault offenses, we consider, among other factors, whether the sexual penetrations or intrusions occurred at different locations, were the product of new volitional departures or were separated by intervening events, and their temporal and spatial proximity. People v. Morales, 2014 COA 129, Â¶60.

 Â¶246Â Â Â Â Â Â Â Â  Markoâs statement to the police that he had anal sex and vaginal sex with the victim was the only evidence regarding these acts. Markoâs statement did not provide any details from which we can evaluate whether there was, for instance, a break in time or intervening event or movement of Marko or the victim that separated the different sexual acts, or whether there was any other kind of break in Markoâs actions or any other âsuggestion of a fresh impulse or opportunity to renew the intent to inflict a new assault.âÂ See id. Nor did Markoâs statement provide information regarding whether the acts occurred in different locations. Thus, because we cannot discern from the evidence that the acts were separated in time, occurred in different locations, or were the product of new volitional departures, we conclude that the prosecution presented insufficient evidence that Marko committed two factually distinct offenses. See id. at Â¶61.

 Â¶247Â Â Â Â Â Â Â Â  Accordingly, Markoâs two sexual assault convictions violate the constitutional prohibition against double jeopardy, and we vacate one of those convictions. Because the effect of a jury verdict must be maximized, we vacate the conviction for which the shorter sentence was imposed â sexual assault (anal). See People v. Delci, 109 P.3d 1035, 1038 (Colo. App. 2004).

 XI. Conclusion

 Â¶248Â Â Â Â Â Â Â Â  Markoâs convictions and sentences for attempted sexual assault and sexual assault (anal) are vacated and the case is remanded to the trial court to correct the mittimus accordingly. In all other respects, the judgment of conviction is affirmed.

 JUDGE TAUBMAN and JUDGE KAPELKE concur.


 [1] This section provides a general overview of the relevant facts. Specific facts pertinent to our analyses are discussed in other sections of the opinion as necessary.

 [2] We reject Markoâs argument that People v. Novotny, 2014 CO 18, does not apply retroactively. People v. Wise, 2014 COA 83, Â¶10, concluded that retroactive application of Novotny does not violate a defendantâs due process rights, and other divisions of this court have followed Wise. See, e.g., People v. Maestas, 2014 COA 139M, Â¶6. Because we believe that Wise was correctly decided, we decline to revisit its holding.

 [3] The record is unclear whether the handcuffs were removed when Marko entered the station or only after he entered the interview room. We will assume that the handcuffs were not removed until Marko was in the interview room.

 [4] In any event, we are not bound by Rogers. To the extent that Rogers could be read broadly to hold that a soldier is in custody any time a superior military officer directs him or her to report for questioning by civilian law enforcement, we disagree and do not follow it, particularly in view of the cases, discussed below, that refuse to find custody every time a prison inmate is interrogated. Cf. United States v. Santiago, 966 F. Supp. 2d 247, 261, 265 (S.D.N.Y. 2013) (disagreeing with Rogers to the extent that Rogers can be interpreted to hold that every interview with military law enforcement personnel is necessarily custodial or that a soldier is in custody any time a military superior questions him or her).

 [5] The People argue that we should not consider whether Marko invoked his right to silence because he was not in custody when he said that he wanted to go home, and an invocation is not effective unless it is made during custodial interrogation. Because we conclude that Marko did not invoke his right to silence, we need not address whether any invocation would have been effective.

 [6] There is conflicting evidence in the record as to whether the magistrate administered an oath to the detective over the phone. The trial court found that the oath was administered. We defer to that finding because it is supported by evidence in the record and it is the trial courtâs prerogative to resolve conflicts or inconsistencies in the evidence on a motion to suppress.

 [7] We do not address whether a military barracks constitutionally may be searched only upon the issuance of a search warrant. Rather, we hold only that under the circumstances here, the search was constitutional.

 [8] The supreme court recently announced Perez v. People, 2015 CO 45, Â¶Â¶30, 43, which addressed a situation in which the erroneous admission of evidence was so prejudicial to the defendant that the supreme court could not presume that the jury was able to follow the limiting instructions provided. However, although Perez decided that the limiting instructions in that case were inadequate to cure the erroneous admission of evidence, it did so based on the specific facts of the case. See id. We thus do not interpret Perez as overturning the general rule that, absent evidence to the contrary, courts presume that the jury follows the trial courtâs instructions.

 [9] Although they concede the issue on the merits, the People argue that we should not review Markoâs merger argument because he did not raise it below. Divisions of this court are split regarding whether a defendant waives an unpreserved double jeopardy challenge, with some divisions concluding that the challenge is waived and others concluding it is reviewed for plain error. See, e.g., People v. Carter, 2015 COA 24M, Â¶75 n.5 (discussing the split). The supreme court has granted certiorari on this issue in several cases. See id. We conclude that unpreserved double jeopardy issues may be reviewed for plain error on appeal, and we thus reject the Peopleâs waiver argument.




These opinions are not final. They may be modified, changed or withdrawn in accordance with Rules 40 and 49 of the Colorado Appellate Rules. Changes to or modifications of these opinions resulting from any action taken by the Court of Appeals or the Supreme Court are not incorporated here. 



Colorado Court of Appeals Opinions || October 8, 2015


Back